839 A.2d 784

Daniel SLICK

v.

Mary Beth REINECKER.

No. 1995, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 23, 2003.

John A. Mattingly, Jr. (Baldwin, Briscoe & Mattingly, Chtd., on brief), Lexington Park, for appellant.

T. Myron Loyd, Bowie, for appellee.

Argued before DAVIS, SALMON, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, J.

The appellee, Mary Beth Reinecker, Esq., sued the appellant, Daniel Slick, in the Circuit Court for St. Mary's County for breach of contract. The case was tried by the judge, sitting without a jury. The alleged contract was one involving the legal representation of the appellant by the appellee in a motor vehicle tort case.

## A Contract Implied in Law, But No Contract Implied in Fact

There was no written contract between the parties. The appellee attempted to prove that there was a contract implied in fact. The court found that there was not. It did find in the alternative, however, that there was a contract implied in law. On the basis of it, it made an award of $13,000 to the appellee. This appeal is from that award.

The evidence fully supports the court's findings that 1) there was between Daniel Slick and Mary Beth Reinecker no contract for professional legal services, either express or implied in fact; but 2) there was between them an exchange of services that amounted to a contract implied in law.

## A Contract Implied In Fact

 The two terms, although they resemble each other linguistically in that each contains the word "contract," are diametrically different in terms of the legal relationships they denote. A contract implied in fact is actually a contract. As Judge Salmon explained for this Court in *Mogavero v. Silverstein*, 142 Md.App. 259, 275, 790 A.2d 43 (2002):

> An implied-in-fact contract is a "true contract" and "means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words." Implied-in-fact contracts are "dependent on mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required."

 In *Mogavero v. Silverstein*, 142 Md.App. at 277, 790 A.2d 43, we quoted with approval from *Eaton v. Engelcke Manufacturing, Inc.*, 37 Wash.App. 677, 681 P.2d 1312, 1314 (1984):

> *A true implied contract*, or contract implied in fact, *does not describe a legal relationship which differs from an express contract: only the mode of proof is different.*

(Emphasis supplied).

Vol. 1, *Williston on Contracts*, § 1.5, pp. 20–21, by Richard A. Lord (1990), also described an implied-in-fact contract.

> *The term* implied or inferred contract, also sometimes called an *implied in fact contract, refers to that class of obligations which arises from mutual agreement and intent to promise,* when the agreement and promise have *simply not been expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are* nevertheless *true contracts,* and may properly be called inferred contracts or contracts implied in fact.

(Emphasis supplied).

 In *Mass Transit Administration v. Granite Construction Co.*, 57 Md.App. 766, 774, 471 A.2d 1121 (1984), Judge Bloom defined the term.

> The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words. In other words, *the [implied in fact] contract is proved by circumstantial evidence.*

(Emphasis supplied).

In *County Commissioners of Caroline County v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 94, 747 A.2d 600 (2000), Judge Cathell wrote to a similar effect for the Court of Appeals.

> An express contract has been defined as "an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." *"An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances* and 'the ordinary course of dealing and the common understanding of men.'" [S]ee *Klebe v. United States,* 263 U.S. 188, 192, 44 S.Ct. 58, 59, 68 L.Ed. 244 (1923) (*"A contract implied in fact is one inferred from the circumstances or acts of the parties;* but an express contract speaks for itself and leaves no place for implications.").

(Emphasis supplied). So much for a contract implied in fact.

### A Contract Implied in Law

By sharp contrast, what is confusingly called a contract implied in law is actually no contract at all. In *Mass Transit v. Granite,* 57 Md.App. at 775, 471 A.2d 1121, Judge Bloom laid out the diametric difference between the two concepts.

> *A* quasi-contract or *implied in law contract, on the other hand, involves no assent between the parties, no "meeting of the minds."* Instead the law implies a promise on the part of the defendant to pay a particular "debt." Thus, *"[t]he implied in law contract is indeed no contract at all,* it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs

to the plaintiff in some sense." It is from quasi-contract that "the common counts in general *assumpsit* came into use, notably the counts for money had and received, for goods sold and delivered (*quantum valebat* ), and for work and labor done (*quantum meruit* )." Although quasi contract is often described as "equitable" and indeed recovery in restitution is based upon notions of justice and fairness, "this refers merely to the way in which a case should be approached, since it is clear that the action is at law and the relief given is a simple money judgment."

(Emphasis supplied).

In *Caroline County v. Dashiell,* 358 Md. at 94–95, 747 A.2d 600, the Court of Appeals also took note of the difference. Finally, significant to our analysis is *the definition of a quasi-contract. Black's Law Dictionary,* [6th ed.1990] at 324 defines it *as a*

> *[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract,* but where circumstances are such that justice warrants a recovery as though there had been a promise. It is not based on intention or consent of the parties, but is founded on considerations of justice and equity, and on [the] doctrine of unjust enrichment. *It is not in fact a contract,* but an obligation which the law creates in absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it.

(Emphasis supplied).

In *Dashiell,* 358 Md. at 95 n. 6, 747 A.2d 600, Judge Cathell juxtaposed the two legal relationships.

Historically, there were two types of implied contracts: contract implied by fact and contract implied by law. They have distinct meanings. *An implied by fact contract is "inferred from conduct of parties* and arises where plaintiff, without being requested to do so, renders services under

circumstances indicating that he expects to be paid therefor, and defendant, knowing such circumstances, avails himself of benefit of those services." *A contract implied by law is now what commonly is called quasi-contract.*

(Emphasis supplied).

The *Restatement (Second) of Contracts,* § 4 (1981), also describes the quasi-contract or implied-in-law contract.

Quasi-contracts have often been called implied contracts or contracts implied in law; but, *unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises.* They are obligations created by law for reasons of justice.

(Emphasis supplied).

It may seem incongruously Orwellian to the modern mind to refer to something that is truly not a contract at all as a "contract implied in law." Why not describe the legal obligation in terms of what it is, rather than as something it emphatically is not? 1 *Dobbs Law of Remedies* (2d ed.1993), § 4.2(1), p. 571, has explained why, historically, it was necessary to resort to the linguistic fiction in order to make a desired remedy available.

The more significant stream of restitution derived from the writ of assumpsit....

*Assumpsit was the common law form of action by which contract claims were redressed.* Sometimes the contract would be express, sometimes implied by the parties' actions, but in either event a genuine contract. However, *the assumpsit action also came to be used when the parties had no contract at all,* so long as the plaintiff could convince the court that he ought to recover something from the defendant as a matter of justice or good conscience.

The connection to assumpsit is obscure to modern minds. *The common law forced the plaintiff to sue under one of a limited number of forms of action or writs. Assumpsit was a good choice, but to make it work it was necessary for judges to relate the claim to some kind of contract,* promise

or undertaking. *The common law judges were up to the task. They simply said that, although the defendant had promised nothing, if justice called for relief, then the law would imply a promise* and then hold him liable on that implied promise.

. . . .

Courts explained liability in assumpsit by saying that the defendant was liable on an implied contract. *Because the term "implied contract" might be confused with the idea of an implied in fact contract, judges sometimes use the term "implied in law contract" instead, tacitly recognizing that this kind of claim had nothing to do with a genuine contract.* Another term for the implied in law contract is quasi-contract. So restitutionary claims of the kind involved in the second stream is still often referred to as claims for *assumpsit,* or claims based on *implied in law or quasi-contracts.*

(Emphasis supplied). The fiction has served its purpose, but it does require us to keep our wits about us when talking Newspeak. When dealing with a "contract" that is not a contract, steer meticulously clear of contract law!

### The Evidentiary Background

When we reach the issue of computing the appropriate remedy, we shall return to the caselaw bearing on contracts implied in law. For the moment, we shall turn to the evidence supporting the court's findings as to the nature of the relationship between Daniel Slick and Mary Beth Reinecker in this case. On July 30, 1999, Slick was injured in an automobile accident. There was no question but that the liability rested exclusively on the other motorist, who was uninsured. Initially, Slick filed his PIP (personal injury protection) claim with the Maryland Automobile Insurance Fund (MAIF) and received the maximum allowable recovery from it of $20,000.

Ms. Reinecker was a neighbor and a social friend of Slick and his family. She is an attorney and, at the time of Slick's accident, had been doing personal injury work in Maryland

and the District of Columbia for about three years. Although there was some brief and informal conversation between Slick and Ms. Reinecker about his initial filing of his PIP claim with MAIF, Ms. Reinecker agrees that Slick acted on his own behalf in pursuing his initial claim against MAIF. In her trial testimony, she recounted her knowledge of what Slick had done vis-a-vis MAIF.

Q And what ultimately happened to the liability claim?

A As to MAIF?

Q Yes, as to MAIF.

A *He had the discussions with MAIF and he resolved the matter.*

Q And that was resolved by?

A By Mr. Slick, Dan.

Q Okay. And what was the—*how was it resolved?*

A *I believe he negotiated with them and he received their policy limits.*

(Emphasis supplied).

Once having resolved his claim against MAIF, Slick undertook to pursue his Underinsured Motorist claim against his own carrier, State Farm Insurance Company. The policy limit was $100,000 minus the amount recovered from MAIF for a remaining policy limit of $80,000. It was with respect to Slick's ultimate recovery of $80,000 from State Farm that the present controversy arose. The issue is that of what role, if any, Ms. Reinecker played in obtaining that $80,000 recovery.

### From July 30, 1999 Through Late July or Early August, 2000

The most confusing aspect of this case stems from the fact that Ms. Reinecker seizes every evidentiary factoid bearing on what she may have done for Slick or even said to Slick from the occurrence of the accident on July 30, 1999, and the offer by State Farm of $80,000 on October 10, 2001, and tosses them into a single evidentiary pot, which she then stirs vigorously.

The problem is that each evidentiary fragment needs to be sorted out and placed into one of two very distinct receptacles. One category is for those things that occurred while Ms. Reinecker was still Slick's neighbor, essentially through the mid-summer of 2000. The second category is for those events that happened after Ms. Reinecker 1) moved away to New Jersey in June or July of 2000 and 2) then, several weeks later, had a telephone communication with Slick, which she places as having occurred in late July or early August.

The critical distinction between the two time periods is that nothing that happened prior to that late-summer telephone call either 1) is dispositive on the nature of the relationship between Slick and Ms. Reinecker after the telephone call or 2) has any bearing on the remedy, if any, to which Ms. Reinecker might be entitled for services rendered after that call.

Ms. Reinecker does not allege that she represented Slick prior to that mid-summer telephone call.

Q Okay. Now, exactly, *can you give me an exact date when your representation of Mr. Slick began?*

A *The exact date, no,* I cannot. *All I can tell you is the exact phone call.*

Q Okay. *Can you give me a month?*

A *I believe it was in late July.*

Q *Late July of what year?*

A Of 2000.

Q July of 2000?

A *Two thousand, after I moved.*

(Emphasis supplied).

Everything that happened prior to that time constituted only the gratuitous advice of a friend and neighbor. Ms. Reinecker's suggestion to Slick was that he did not actually need a lawyer and that she could "walk him through the whole process" so that he could, in effect, handle his claim himself.

Q *You advised Mr. Slick* at the time of the—shortly after the accident, *to actually not retain an attorney.*

A *Absolutely.*

Q In fact, *you told him that you would walk him through the whole process.*

A *I told him I would.* Dan was a neighbor whose family was going through hard times. They had potentially serious injuries. I told him I would take care of him. *I would help him through it free, no big deal. We were friends.*

Q And he helped you also, correct?

A Yes, he helped my family, yes, when we needed it, yes, as we helped his family when he needed it.

Q In fact, he did work for you also, isn't that correct?

A He helped do some electrical work and my husband, I think, helped him do something on his deck one day.

Q But he did do work for you?

A Yes. And that is why I mean I didn't think of it tit for tat. This was something that I thought I could help him with.

(Emphasis supplied).

It was during that first year that Slick made contact with MAIF and that MAIF tendered him its policy limits of $20,000. Although the actual delivery of the check was delayed by some weeks, pending the adjustment of a medical lien held by Health Care Recoveries, all negotiations with MAIF had been concluded by the late spring of 2000. Indeed, Ms. Reinecker acknowledged that Slick had handled his case with MAIF directly, "He had the discussions with MAIF and he resolved the matter." As to what that resolution consisted of, she stated, "I believe he negotiated with them and he received their policy limits."

It is also clear that it was during that first year that Slick himself wrote to State Farm directly to put it on notice of "a possible underinsured motorist (UIM) claim." On the very day after the accident, he spoke with his State Farm agent and got the name of Pamela Izquierdo, the ultimate claims processor. Within several days, Slick and Ms. Izquierdo were

in person-to-person telephone contact. On December 8, 1999, Slick sent her formal notice of his possible UIM claim.

Dear Pam:

As you are aware, I was involved in an automobile accident on the above referenced date. *Please consider this letter as notice of a possible underinsured motorist (UIM) claim.*

Please continue to direct all future contacts with me, as *I intend to handle this matter without retaining an attorney.* Additionally, please confirm receipt of this correspondence in writing.

If you have any questions, comments or concerns regarding this matter, please do not hesitate to contact me.

Very truly yours,

/s/

Dan

(Emphasis supplied).

Actually, Slick had already received a claim number and a letter from Cherrie Hawkins, a claims processor who at times assisted Pamela Izquierdo in processing the PIP portion of his claim. Ms. Hawkins gave him detailed descriptions of the various medical bills and expenses and proofs of loss of income that he would have to submit. There was an extensive file of exchanged correspondence and FAX messages between Slick and both Cherrie Hawkins and Pamela Izquierdo during September, October, November, and early December of 1999.

On December 14, 1999, Slick received formal acknowledgment of his possible UIM claim.

Re: Claim Number: 20–5139–693

Date of Loss: July 30, 1999

Insured: Daniel G. Slick

Dear Mr. Slick:

This is to acknowledge your letter dated December 8, 1999 which stated that you may have a possible UIM claim. Please forward all future correspondence to my attention.

Sincerely,

Pam de Jesus [later Izquierdo]

Senior Claim Representative

It was still during the gratuitous phase of Ms. Reinecker's assistance to Slick that she herself first contacted State Farm on May 25, 2000. Significantly, she referred to her role not as one in which she was representing Slick but as one in which she was "assisting Mr. Slick in the handling of his claim."

> Please be advised that *I am assisting Mr. Slick in the handling of his claim.* As you may be aware, MAIF has offered their policy limits with regard to the liability claim against their insured, Mr. Brian Mayle. At this time I am requesting that you waive subrogation in accordance with § 19–511 of the *Insurance Article* of the *Annotated Code of Maryland.*

(Emphasis supplied). The subject matter of the letter was the waiving of subrogation by State Farm so that Slick could finalize his MAIF claim.

It is clear that by the late summer of 2000, all of Slick's claims against MAIF had been successfully concluded and that State Farm was fully apprised of his imminent UIM claim against it. He was already in extensive communication with two of its claims representatives. Whatever informal and gratuitous advice Ms. Reinecker may have given to Slick during this initial period, nothing that occurred through the late summer of 2000 could serve as the basis for any claim by her for compensation for professional services rendered.

### A Changed Interpersonal Relationship

The nature of the relationship between Slick and Ms. Reinecker changed dramatically, however, during the summer of 2000. Ms. Reinecker's marriage broke up. The closest aspect of the pre-breakup social relationship had actually been the friendship between Slick and Ms. Reinecker's ex-husband. In June or July of that year, Ms. Reinecker's husband left her with two young children. Ms. Reinecker consequently left Maryland and moved to New Jersey.

Some weeks after the move, Ms. Reinecker, through her mother in Philadelphia, received a letter from State Farm concerning Slick's case. It was in the course of the telephone call in which she passed that communication on to Slick that the nature of the relationship between the two of them changed. On direct examination, she described that phone call.

Q And when you say you had a discussion with Dan about the status of his case, what was the nature of that discussion? This is after you moved out of state?

A *This was after I moved out of State.* Actually, his wife was on first, and then Dan got on the phone. I vividly remember sitting in the dining room. His wife said, first, she realized the circumstances had changed. *They wanted to hire me and* that *they would pay me. Dan gets on the phone* subsequently *and reiterates the same thing,* that *they needed my services and they wanted me to continue on. I had no interest. I had my own problems to deal with at the time.*

(Emphasis supplied). On cross-examination, Ms. Reinecker elaborated on that change in the relationship.

Q But that all changed?

A When I moved.

Q Okay. And why did that change?

A I left Maryland with a two month old baby and a four year old. My marriage was over. I didn't care. *I had no time for anything. I didn't want to be involved in anything. I stopped.* I had my own problems, my own family to worry about. It was a phone call, which I did not initiate the conversation. It was Dan and his wife said—I am sorry— first time I talked to them since the separation, "I am sorry I know things have changed, we will pay you. We want you to work with this. We want you to handle this for us." They started the conversation. *At that point in time, sure, if I was getting paid—I wasn't, at that time, to do free work.* I had a lot on my plate then.

Q You had a—had a lot on your plate then?

A I had a lot on my own personal plate, yes.

Q But you weren't working at the time?

A No, but my marriage was over, I had a two month old baby, I was looking for a job. I had a part time job that came to an end. I was trying to purchase a house. I was living with my sister. I had a lot going on.

(Emphasis supplied).

Slick's testimony, on the other hand, was that such a telephone call in which he allegedly requested Ms. Reinecker's professional services never took place.

Q *[S]he described a phone call in July of 2000 where she states that you called her in, I guess, New Jersey or Pennsylvania, and requested that she represent you. Did that phone call take place?*

A *No.*

Q Did you, once you were injured, *did you handle your MAIF claim yourself?*

A *Primarily, yes.*

Q And *did you obtain all your medical records?*

A *Yes.* Yes, I did.

Q *Did you write your demand letter?*

A *Yes.*

(Emphasis supplied).

On cross-examination, Slick stated that he was never at any time under any impression that Ms. Reinecker was seeking payment for her services and that the only time the subject of money came up was when he and his wife offered a gift of $5,000 to Ms. Reinecker on October 23, 2001, after State Farm had finally settled the claim.

Q And you understood at that point in 1999 that she was not seeking any payment from you for handling the MAIF claim or the PIP claim, is that right?

A *I was under the impression the whole time that she was not seeking any payments of any kind at any point.*

Q I am just talking about October of '99, when you were talking about the gift?

A Yes.

Q Okay. At some point did you offer to pay her?

A We offered her a gift of $5,000. I believe it was on the 23rd of October, 2001.

(Emphasis supplied).

## The Trial Judge's Rulings

Ms. Reinecker claimed that, with respect to her representation of Slick following her move to New Jersey, she had an express oral contract with Slick for a contingency fee of between 30% and 40% of the gross amount of the ultimate recovery, either by way of settlement or trial. The trial judge ruled that not only was there no express contract, but that there was not even a contract implied in fact.

In this case, the plaintiff contends that, although a written contract setting forth services and a contingency fee was not executed, a contract implied-in-fact exists between the plaintiff and the defendant. A contract implied-in-fact is a "true contract" and "means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words." *Mass Transit Administration v. Granite Construction Co.,* 57 Md.App. 766, 774, 471 A.2d 1121 (1984). A contract implied-in-fact relies on a "mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required." 17 C.J.S. Contracts § 6(b) at 422.

In the case at hand, it is difficult to ascertain if there was a meeting of the minds between the parties as to the essential elements of the agreement. The plaintiff asserts that she was hired to handle the UIM claim that the defendant was making due to an automobile accident. Plaintiff further claims that the defendant agreed to pay her for her services and that the payment was understood to be a 30–40% contingency fee. On the other hand, the defendant states that the plaintiff volunteered her services and

that there was no agreed upon fee. Even if the Court were to assume that the plaintiff was correct in contending that there was an express agreement, it would be difficult to infer what the parties intended that agreement to specifically cover. Even after the alleged agreement was made, both parties continued to actively participate in and follow up on the UIM claim. This fact makes it very difficult for the Court to infer that the parties had a meeting of the minds as to what specific services were going to be rendered in return for what specific fee. Therefore, *the Court finds that a contract implied-in-fact did not exist between the parties.*

(Emphasis supplied). We affirm that ruling.

▆▆▆ The court ruled in the alternative, however, that there was a contract implied in law. Reserving comment for the moment as to which professional services were encompassed within that contract implied in law, we hold that the evidence was legally sufficient to support a ruling that there was a contract implied in law, at least with respect to those services that were rendered after the late summer of 2000, and that Ms. Reinecker was no longer providing advice free of charge.

In the alternative, the plaintiff argues that a contract implied-in-law existed between the parties. A contract implied-in-law differs from a contract implied-in-fact because it requires no meeting of the minds. A contract implied-in-law is not really a contract at all, "it is simply a rule of law that requires restitution to the plaintiff of something that came into the defendant's hands but belongs to the plaintiff in some sense." *Mogavero v. Silverstein,* 142 Md.App. 259, 790 A.2d 43 (2002).

In this case, *it is clear that the Plaintiff did offer some services to the Defendant and that the plaintiff did assist the defendant throughout the insurance process.* Furthermore, it is clear that the defendant either accepted or acquiesced in the services and assistance given by the plaintiff.... The Court finds that the knowledge and experience of the plaintiff were both things that belonged to the plaintiff but that came into the hands of the defendant.

Therefore, *the Court finds that a contract implied-in-law does exist.*

(Emphasis supplied).

## Computing the Amount of Recovery

At this point in our review, we are in full accord with the trial judge in his findings 1) that there was no implied-in-fact contract but 2) that there was an implied-in-law contract between Slick and Ms. Reinecker. We part company, however, with respect to the reckoning of the recovery.

The first limitation on that recovery we have already discussed, at least indirectly. It is that the only professional services that may be taken into account for recovery purposes are those that were rendered between 1) late July or early August of 2000 (for linguistic convenience, we will call it August 1, 2000) and 2) October 10, 2001, when State Farm offered to pay Slick $80,000. After finding that there was a contract implied in law, the trial court then catalogued a number of services that it believed were compensable under that theory of recovery.

The plaintiff provided to the defendant knowledge of the procedure and law involved in making a UIM claim. Specifically, the plaintiff advised the defendant how to preserve the UIM claim when the MAIF claim was finalized, she advised the defendant to obtain a permanency rating, she provided the defendant with copies of demand letters to mimic, she assisted in negotiating the claim and explained to the defendant about the statutory amount that can be deducted from a subrogation claim.

We note, however, that a major part of that assistance was rendered before August 1, 2000, during the time in which Ms. Reinecker was still assisting her neighbor on a purely gratuitous basis and before that time when, she claimed, a professional relationship was created. It could not, therefore, serve as the basis for a proper recovery.

Another limitation on the calculation of the recovery is that it may not be computed on the basis of a contingent

fee in a case where the theory of recovery is that of a contract implied in law. A contingent fee is a contractual arrangement and is not based either on the actual *ad hoc* value of the services rendered in a particular case or on the actual *ad hoc* settlement accruing to the client in a particular case.

Although Ms. Reinecker claimed that she had a contingent fee arrangement with Slick and was entitled to $33,333.33 as "an amount equal to her customary rate of one-third contingency fee" of the total $100,000 recovery ($20,000 from MAIF plus $80,000 from State Farm), the trial judge found that there was no such contractual relationship and the evidence, we have held, supported that finding. A contract implied in law, by contrast, is simply not a contract at all.

Indeed, even in the case of an actual contract, Maryland Rule of Professional Conduct 1.5(c) prohibits the use of a contingent fee arrangement except in cases of an express contract and where the terms of the fee arrangement are detailed and set out in writing.

A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **The terms of a contingent fee agreement shall be communicated to the client in writing.** The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

(Emphasis supplied). See also *Attorney Grievance Commission v. Briscoe*, 357 Md. 554, 565, 745 A.2d 1037 (2000).

 Because a contingent fee arrangement is generally something established by contract and not by proof of any particularized value in a specific case, it may not be used as a measure of recovery in a case involving a contract implied in law, because a contract implied in law is not a contract. It is an inappropriate measure, whether applying 100% of an ordinary contingent fee or, as in this case, 50% of an ordinary contingent fee. The court, however, clearly calculated the award to Ms. Reinecker on the basis of one-half of a customary contingent fee.

> [T]he Court finds that the defendant gained $13,000 worth of knowledge and services of the plaintiff. *This amount is based on the fact that the defendant gained about one half of the services that an attorney would normally provide to a client. If the defendant had gained all of the services* an attorney would normally give, *he would be required to pay* restitution in the amount of those services, which would *normally be 30–40%. Since the defendant only gained about one half of the services, he is only required to pay one half of the normal cost of those services.*

(Emphasis supplied). This, we hold, the court was not permitted to do in a case such as this, based only on an implied-in-law contract. If 100% of a contractual fee arrangement is an inappropriate measure of damages in cases not involving such a hypothetical contract, so too is the use of any given fraction of such a contractual fee arrangement. In whole or in part, the use of a customary contingent fee as the multiplicand is not permitted.

### The Measure of the Recovery For
### an Implied–in–Law Contract

In *Mass Transit v. Granite Construction*, 57 Md.App. at 774, 471 A.2d 1121, Judge Bloom explained that the "restitutionary remedies" are based on the theory of unjust enrichment and that the chief of these remedies, at law, is the contract implied in law.

At law, the chief restitutionary remedy is quasi-contract. That is the remedy with which we are now concerned.

Quasi-contract, as has often been said, is not really a contract at all. It is, rather, an "implied in law" contract, distinguishable from an implied in fact contract which is a true contract.

Quoting from Dobbs, *Handbook on the Law of Remedies* (1973), § 4.1, we pointed out, 57 Md.App. at 775, 471 A.2d 1121, that the measure of recovery in such a case is the "gain to the defendant."

It should also be remembered that a money judgment recovered by virtue of quasi-contract is a remedy to prevent against the unjust enrichment of the defendant. Thus, *the measure of the recovery is the gain to the defendant, not the loss by the plaintiff.*

The restitution claim stands in flat contrast to the damages action in this respect. The damages recovery is to compensate the plaintiff, and it pays him, theoretically, for his losses. *The restitution claim,* on the other hand, *is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep.*

(Emphasis supplied).

In *Mogavero v. Silverstein,* 142 Md.App. at 274, 790 A.2d 43, a critical issue was the proper measure of recovery in a case of a contract implied in law.

Appellant alleges that the lower court erred when it granted summary judgment as to Count II, in which appellant sought *quantum meruit* recovery. In this regard, *the question that separates the parties concerns proof of damages.*

(Emphasis supplied).

The defendants in *Mogavero* contended that the plaintiff was required to prove an actual gain enjoyed by the defendant, something which the plaintiff had not proved. The plaintiff, on the other hand, contended that it was enough for him to prove the reasonable value of the services he performed, something which he arguably had proved.

Appellees maintained, and the motions court agreed, that plaintiff was required to prove the value to the *defendants* of the services rendered by Mr. Mogavero. On the other hand, appellant contends that the measure of damages is the reasonable value of the services rendered by him. *The measure of damages is here of critical importance because appellant failed to demonstrate that he could produce any evidence as to the reasonable value to appellees of the services he performed.* On the other hand, Mr. Mogavero, at least arguably, did produce evidence as to the reasonable value of his services.

142 Md.App. at 274, 790 A.2d 43 (emphasis supplied).

Judge Salmon began this Court's analysis in *Mogavero* by pointing out that there is a *quantum meruit* recovery permitted in cases of both implied-in-fact contracts and implied-in-law contracts but that the two forms of *quantum meruit* recovery are separate and distinct.

The Latin term *quantum meruit* means "as much as deserved."

*Quantum meruit* refers to either an implied-in-fact contractual duty or an implied in law (quasi-contractual) duty requiring compensation for services rendered. *The distinction between these two forms of quantum meruit is important, as the two claims require distinct remedies.*

142 Md.App. at 274–75, 790 A.2d 43 (emphasis supplied).

■ Judge Salmon made it very clear that in a case involving a contract implied in law, the proper measure of a recovery is not the fair value of the plaintiff's services but the actual gain to the defendant.

The measure of recovery in quasi-contract (implied in law) cases is based upon restitution. Restitution, in turn, is referred to as an action for unjust enrichment.

. . . .

*[T]he classic measurement of unjust enrichment damages is the "gain to the defendant, not the loss by the plaintiff."*

Recovery on a contract implied in fact, on the other hand, is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services.

142 Md.App. at 276, 790 A.2d 43 (emphasis supplied).

Of particular pertinence to this case is Judge Salmon's observation in *Mogavero* that claims to recovery based on contingency fees are claims for a remedy for an implied-in-fact contract, not for an implied-in-law contract.

A category of *quantum meruit* cases relied upon by appellant is that of claims brought by attorneys for compensation under a contingency-fee contract where the client, without good cause, revokes the contract. Although no Maryland case has explicitly discussed the issue, *attorneys discharged without cause who have entered into contingency-fee agreements are entitled to recovery based on contracts implied in fact,* inasmuch as (1) the services are rendered under circumstances that indicate that the attorney rendering the services expects to be paid; (2) the client expects, or should expect, to pay for those services if he discharges his attorney without cause; and (3) there is a meeting of the minds. In contingency-fee agreements there typically is no expressed agreement by the parties as to any alternative measure of compensation for the attorney in the event that the attorney is discharged without cause. And, once discharged, the attorney cannot recover for services rendered under the contingency-fee agreement because its enforcement is barred for reasons of public policy. Damages in cases where the attorney is discharged without cause are the reasonable value of the services he or she has rendered. *This is,* as we have seen, *the remedy for the breach of an implied-in-fact contract.*

142 Md.App. at 277–78, 790 A.2d 43 (emphasis supplied).

In the *Mogavero* case itself, the plaintiff proved successfully that a contract implied in law did exist, but he failed to offer legally sufficient proof of gain to the defendants. Accordingly,

summary judgment was properly granted in favor of the defendants.

The Maryland cases seem to abide generally by the rule that if specific services are requested by the defendant, the contract is treated as one implied in fact and recovery is allowed for the reasonable value of the plaintiff's services; but *if there is no meeting of the minds* as to what services are to be rendered, *the contract is treated as one implied in law, where the measure of damages is the amount, if any, of the defendant's gain—not the reasonable value of plaintiff's services.*

*[A]ppellant did prove an implied-in-law contract with appellees.* While "no assent between the parties [and] no meeting of the minds" was proven, the law nevertheless "implies a promise on the part of the defendant[s] to pay." *Mr. Mogavero failed to prove the value to the defendants of the services he rendered.* Because restitution damages are the same as damages recoverable for unjust enrichment, and *because the measure of damages for unjust enrichment is the gain to the defendant, not the loss by the plaintiff,* the *motions judge did not err when she granted summary judgment as to Count II.*

142 Md.App. at 281–82, 790 A.2d 43 (emphasis supplied).

Under the circumstances, much of Slick's argument about whether Ms. Reinecker's fee was fair and reasonable in view of the services actually rendered is beside the point. Because this is a contract implied in law case, our concern is not with the reasonable value of the services rendered by Ms. Reinecker but with the extent to which those services were the effective catalyst for a quantifiable gain to Slick that would not have accrued if he had not received the benefit of those services.

### The Measurable Gain Must Have Been Post–August 1, 2000

It is clear that in the computing of an award under an implied-in-law contract, any "gain" accruing to Slick must be as a result of the services rendered by Ms. Reinecker pursu-

ant to that implied-in-law contract, to wit, after August 1, 2000, and not as a result of any gratuitous services rendered by her to him before August 1, 2000, to wit, at a time before which, even by Ms. Reinecker's reckoning, any implied contract existed. Even she predicates her implicit contractual relationship with Slick upon the critical mid-summer of 2000 telephone conversation between them. A recovery based on an implied-in-law contract must be based on services rendered and "gain" thereby produced pursuant to that implied contract.

Even taking Ms. Reinecker's most favorable version of that situation-altering telephone call, its gist was, "I am in a totally new situation and I must charge you for any professional work I do for you from this time forward." There was no suggestion, even by Ms. Reinecker, that that telephone call included the additional proviso, "And, furthermore, I must charge you, retroactively, for all the free advice and assistance I have already given you over the course of the preceding year." Such a retroactive proviso was not part of any contract implied in law, and any recovery pursuant to the contract implied in law may not be computed as if such a proviso had been a part of it. For purposes of computing the recovery in this case, the world began on August 1, 2000.

■ With respect to any benefit or gain accruing to Slick as a result of any of the gratuitous advice or services rendered by Ms. Reinecker prior to August 1, 2000, the observations of 1 *Dobbs Law of Remedies* (2d ed.1993), § 4.2(3), p. 583, are very pertinent:

> *Most services rendered without request are apt to be* either *given freely with no expectation of payment,* or rendered officiously. *If either of these things is true, restitution is denied* on substantive rather than on formal grounds.

(Emphasis supplied).

### Insufficient Proof Of Gain to Slick

■ Assuming that State Farm might have offered Slick nothing on his UIM claim, the maximum possible "gain" was

the $80,000 that State Farm ultimately did offer. Unlike a contingency fee case, in which an attorney's fee can be computed as a set percentage of that $80,000 settlement, the gain that Ms. Reinecker was obliged to prove, within the contemplation of unjust enrichment law, was the extent to which the $80,000 offer was in excess of what State Farm would likely have ultimately offered Slick in the absence of Ms. Reinecker's efforts on his behalf. What is the evidence of any "gain" for which Ms. Reinecker was responsible?

In terms of Slick's UIM claim against State Farm, one day after the July 30, 1999, accident, Slick himself spoke to his State Farm insurance agent who, in turn, put him in contact with the State Farm claims processor. It is further clear that it was Slick himself who, on December 8, 1999, put the claims processor on formal written notice of his possible UIM claim.

It was on May 25, 2000, that Ms. Reinecker was first in written contact with the State Farm claim representative, notifying her that she was "assisting" Slick in the "handling of his claim."

> *Please be advised that I am assisting Mr. Slick in the handling of his claim.* As you may be aware, MAIF has offered their policy limits with regard to the liability claim against their insured, Mr. Brian Mayle. At this time I am requesting that you waive subrogation in accordance with § 19–511 of the *Insurance Article* of the *Annotated Code of Maryland.*

(Emphasis supplied).

In her trial testimony, the claim representative noted that Ms. Reinecker's reference to "assisting" Slick "was rather ambiguous" and that it was "not the normal language I see in a letter of representation." In her claim activity log, moreover, she characterized Ms. Reinecker as "just assisting." At trial, the claim representative testified with respect to that notation.

> Q Now, when you normally receive a letter of representation, do you normally make that representation that an attorney is "just assisting" a client?

A No.

Q So that is unusual?

A Yes.

On June 27, the claim representative wrote back to Ms. Reinecker:

We are in receipt of your letter from May 25, 2000.

We will waive our subrogation rights against Mr. Mayle, so we would advise that Mr. Slick accept the settlement offer from MAIF.

Please forward all specials pertaining to your client for consideration of his UIM claim. Thank you.

We note, moreover, that this May 25 and June 27, 2000, exchange of correspondence and the waiver of State Farm's subrogation rights so that Slick could wrap up his MAIF claim all occurred during the pre-August 1, 2000, period when Ms. Reinecker, by her own acknowledgment, was still assisting Slick gratuitously.

After a hiatus of some months during which Slick was continuing to receive medical treatment, the UIM claim against State Farm became active in January of 2001. All of the activity at that time was directly between Slick and State Farm and did not involve Ms. Reinecker in any way. On January 5, a State Farm claim representative informed Slick that State Farm did not yet have all of his medical bills and treatment records. The representative also inquired as to his intentions with respect to a UIM claim.

Dear Mr. Slick:

Back on July 10, 2000, Ms. Izquierdo sent you a letter advising that we would waive our subrogation rights against Mr. Mayle so that you could accept the settlement from MAIF.

At that time, Ms. Izquierdo was under the impression that you intended to file an Underinsured Motorist claim. After reviewing your file, it appears that *we do not have all your medical bills and records pertaining to your treatment.* It

appears that we have very little after your PIP coverage was exhausted.

*If you are still interested in filing an Underinsured Motorist claim, please forward all information so that we may evaluate your claim.* If I do not hear from you within the next 30 days, I will assume that you are not interested in pursuing a claim and I will close your file.

(Emphasis supplied).

On January 12, 2001, Slick replied to State Farm. He enclosed all the medical bills he had received as of that time.

*I apologize for being so slow to respond to your letter of July 10, 2000 regarding my underinsured motorist claim.* Unfortunately, I am still undergoing care by my Orthopedic Surgeon in attempts to fully restore my leg to its original mobility after surgery. Therefore, *I have been waiting to finalize treatment. However, I have enclosed copies of all of my bills up through March 2000.* While there are still a number of medical bills from March through the present, I do not have them yet. As they become available I will forward these to you as well.

(Emphasis supplied).

By a five-page letter of April 13, 2001, Slick himself made a formal UIM claim on State Farm. He provided in meticulous detail an account of the accident and of his complete medical diagnosis and treatment since the accident. He enclosed all outstanding medical bills and records of lost employment. He documented medical expenses of $18,000 and lost wages of $8,081. He requested settlement of the full policy limits. His letter concluded:

In addition to my medical expenses of over $18,000, I have incurred lost wages of $8,081 for 217 lost hours of employment. *I have enclosed a up to date copy of the billing records from Greater Metropolitan Orthopaedics. Your office should be in possession of all other above documentation to date, with my damages totaling over $26,000.00. Due to the significant pain and suffering I have endured since July 30, 1999 and knowing that the*

*pain will endure for the rest of my life, I believe that settlement of policy limits is more than warranted in this case.*

*Please contact me within the next three weeks to discuss settlement of this claim.* I look forward to hearing from you in the immediate future.

(Emphasis supplied). Ms. Reinecker did claim to have copyread this letter and to have made several suggested corrections. She admitted, however, that she did "not know what version he actually forwarded."

In the testimony of the witnesses and in the documentary record, the "assisting" letter of May 25, 2000, was the only evidence of any written communication from Ms. Reinecker to State Farm. Other than its acknowledgment letter of June 27, 2000, there was no evidence of any written communication from State Farm to Ms. Reinecker until after the claim was settled. That letter of October 15, 2001, simply enclosed the settlement check. Thus, during the critical period from August 1, 2000 through October 10, 2001, there was no written communication moving in either direction between Ms. Reinecker and State Farm. State Farm's claim representative testified as to this dearth of correspondence.

Q Can you tell me exactly how many pieces of correspondence you sent to Ms. [Reinecker] and how many you received from Ms. [Reinecker]?

A I received one letter from Ms. [Reinecker]. I then responded to that one letter. Then the only other time I corresponded with Ms. [Reinecker] was one other time.

Q Was that after the case settled?

A Right, in October of 2001. So I sent her two letters. She sent me one letter that I have on file.

Q And of the two letters, one was actually the settlement letter, correct?

A Correct.

By contrast, the State Farm file on this case revealed twenty written communications between Slick and State Farm directly.

In her trial testimony, the State Farm claim representative recounted Slick's characterization of Ms. Reinecker's role:

[A]ny time he referred to Ms. [Reinecker], he did say that she was assisting him. But I don't recall he ever used the word representing him. *He always said that he did not want to use an attorney,* or in some of his other correspondence *he said he did not wish to retain an attorney.*

(Emphasis supplied).

The State Farm claim representative also testified to the totality of telephone contact between her and Ms. Reinecker.

Q I would like you to state to the Court the number of times you actually had discussions with Ms. [Reinecker] from the time you first heard her name or first had her appearance in the case, to the final resolution of the case.

Q Actual discussions you had with her.

A Appears to be five.

Q Okay. And would it be fair to say you only had five actual conversations with Ms. [Reinecker] up until the settlement?

A Yes.

The evidence did not show how many of these five conversations actually occurred during the critical period of August 1, 2000 through October 10, 2001. All we know is that the number could not have been more than five. By contrast, the claim representative testified that she talked with Slick directly "at least 20" times.

The extensive log of activity on the case kept by State Farm was introduced as Defendant's Exhibit No. 3. Our review of that log reveals three telephone calls between Ms. Reinecker and State Farm during the critical period of August 1, 2000 and October 10, 2001. On July 2, 2001, Ms. Reinecker informed the claim representative that Slick was "having pain again and wants to go back to see his doctor" but was "still working on his file" and "hopes to wrap it up soon." On July 12, 2001, the claim representative informed Ms. Reinecker that bills from two doctors were still missing from the file.

The final call of October 4, 2001, simply informed Ms. Reinecker that the file was complete and was being evaluated by management.

The only other telephone call we noted was the first call that State Farm received from Ms. Reinecker, that of July 28, 2001, in which State Farm was informed that Ms. Reinecker was "just assisting her former neighbor." As of that time, State Farm had already had extensive and detailed contact with Slick directly for just days short of one full year.

In terms of proof of contributing to the success of Slick's UIM claim against State Farm, therefore, there was no evidence of any written communication between Ms. Reinecker and State Farm between August 1, 2000 and October 10, 2001. During that same period of time, there were no more than three telephone calls between Ms. Reinecker and State Farm. The substance of those calls, moreover, was simply to pass on to Slick, through the conduit of Ms. Reinecker, the fact that several medical bills were still outstanding from State Farm's file and should be forwarded to it by Slick. It was Slick himself who ultimately obtained the missing medical bills and who forwarded them directly to State Farm. On cross-examination, Ms. Reinecker acknowledged that she did not herself obtain any of the medical records.

> Q Did you obtain any medical records for Mr. Slick with regard to his case?
>
> A No.

Ms. Reinecker further admitted that she had no file on the case.

> Q Did you retain any documents whatsoever, copies of any documents that you sent to State Farm on behalf of Mr. Slick?
>
> A No.
>
> Q So you have no letters that you sent to State Farm?
>
> A I have no file.

She further acknowledged that she had no log of any telephone calls.

Q Do you have a log book of any phone calls that you made to State Farm?

A No. I do not.

### The Absence of Any Negotiation

In attempting to show the gain that accrued to Slick through her professional services, Ms. Reinecker makes the bald and conclusory assertion that she successfully "negotiated" the $80,000 settlement. There was no legally sufficient evidence, however, that any actual negotiation ever took place. Although claiming to have negotiated, Ms. Reinecker gave no detail as to when she negotiated or with whom she negotiated. As to the course of the negotiation, her testimony was so vague as to be meaningless.

Q *What was State Farm's opening offer?*

A *I don't remember at this point.*

(Emphasis supplied).

She was not even sure that State Farm had made an offer.

A They didn't offer. They come in with a number, *I believe they did.* What it is, *I don't recall.* It was never that insultingly low, never five thousand.

Q Was it 50 thousand, maybe?

A *I don't have a recollection.*

Q Can you give me a ball park?

A I am sorry, if I could I would. *I really don't recall.*

(Emphasis supplied).

The only meaningful testimony about the $80,000 settlement offer by State Farm came from Pamela Izquierdo, the State Farm claim representative. She testified that State Farm was not in a position to review or evaluate the claim until October of 2001, after all of the medical bills and disability reports were in its file. State Farm's initial offer, on October 10, 2001, was for the policy limit of $80,000. State Farm never made any other, lower offer.

Q Now, I would like to fast forward, if I could, to October of 2001, at the time that the claim was reviewed. *I*

*believe it was October 4th of 2001 that the file was finally completed and you got all the medical and disability reports?*

A (NODDING YES).

Q And shortly thereafter, I believe around the tenth, October 10th of 2001, you were actually in a position to make an offer to resolve the case, and *what was your offer?*

A *The offer was $80,000.*

Q Okay. And *what was your original offer to resolve the case?*

A *$80,000.*

Q *So there was never any other offer other than the $80,000,* is that correct?

A *That is correct.*

(Emphasis supplied).

That offer of the full $80,000 was actually left on Ms. Reinecker's voice mail. Ms. Reinecker was not even on the other end of the telephone line to say anything. As the examination of the claim representative further developed:

Q I would like to turn your attention back to the final telephone conversation where you offered $80,000.00. Can you basically tell the Court, just run down exactly what that conversation, just what did that conversation entail?

A This was, you mean from October 10, 2001.

Q Yes, ma'am, please.

A Okay. It was actually a voice mail message where I stated that we were offering $80,000 to settle Mr. Slick's claim. That was the voice mail to Ms. [Reinecker]. And I asked her to please call me to discuss the settlement.

Q I am sorry, you said you actually left a voice mail saying we are offering 80 thousand?

A Yes.

Q *So there was no negotiation?*

A *No.*

(Emphasis supplied).

Ms. Reinecker's last-ditch effort, in her redirect examination of Pamela Izquierdo, to rehabilitate the fatally wounded case for a negotiation process fell flat on its face.

Q When you reviewed the demand letter [of April 13, 2001], did you, *do you recall any discussions with Ms. Reinecker about some of the contents in the demand letter* where Mr. Slick said that he was continuing to hike and be engaged in pretty rigorous physical activities?

A *You mean when I received Mr. Slick's demand letter, did I have—*

Q Yes.

A—*conversation—I don't believe so,* but—

Q Okay. *Isn't that something that you would-*that you *would be interested in though,* the extent of his recovery and what he was able to do about his injuries?

A *Yes, but* it was clearly stated on his letter what he could do and what he couldn't do. *It was already in his letter, so I didn't have to ask that again.*

(Emphasis supplied).

There was, in the last analysis, no evidentiary basis for so much as an inference that State Farm did not, *sua sponte,* offer the full policy limit of $80,000 to Slick on the inherent merits of his claim or that the offer was ever "negotiated" upward from what it had been initially or from what it otherwise would have been by virtue of Ms. Reinecker's negotiating efforts and skills. Ms. Reinecker's lack of proof of "gain" is precisely the same as was that of the plaintiff in *Mogavero v. Silverstein,* 142 Md.App. at 281–82, 790 A.2d 43, whereof we said:

Mr. Mogavero failed to prove the value to the defendants of the services he rendered. Because restitution damages are the same as damages recoverable for unjust enrichment, *Berry & Gould,* 360 Md. at 151, 757 A.2d 108, and because the measure of damages for unjust enrichment is the gain to

the defendant, not the loss by the plaintiff, the motions judge did not err when she granted summary judgment as to Count II.

### The Challenge to Legal Sufficiency In a Non–Jury Case

In a final effort to forfend the consequences of the fatal insufficiency of her evidence of gain, Ms. Reinecker claims that Slick failed to preserve his claim of evidentiary insufficiency. She points out, quite accurately, that at the end of the plaintiff's case, Slick moved for a defendant's judgment and the motion was denied. She further points out, quite accurately, that, by putting on a defense, Slick in effect withdrew his earlier motion for judgment. She finally points out, quite accurately, that at the end of the entire case, Slick did not again move for a judgment in his favor. This she claims, quite inaccurately, was fatal to his claim of legal insufficiency.

The appellee relies on Maryland Rule 2–519(c), which provides:

> (c) **Effect of denial.** A party who moves for judgment at the close of the evidence offered by an opposing party may offer evidence in the event the motion is not granted, without having reserved the right to do so, and to the same extent as if the motion had not been made. In so doing, the party withdraws the motion.

She claims that, after the "withdrawal" of the earlier motion, there was no motion for a judgment "at the close of all the evidence" and that Rule 2–519 requires such a motion as a prerequisite for challenging the legal sufficiency of the evidence to support a verdict.

The flaw in the argument is that the purported requirement on which Ms. Reinecker relies applies only to a jury trial. This case, of course, was tried by a judge alone, sitting without a jury. A motion for judgment pursuant to Rule 2–519 may be made at the end of the proponent's case in a jury trial and a non-jury trial alike. It is only in a jury trial, however, that a

motion for judgment is appropriate "at the close of all the evidence." Subsection (a) provides, in pertinent part:

*A party may move for judgment* on any or all of the issues in any action at the close of the evidence offered by an opposing party, and *in a jury trial at the close of all the evidence.*

(Emphasis supplied).

It is also clear that Rule 2–519, governing civil procedure, is to be construed consistently with Rule 4–324, its precise counterpart in criminal cases. *Lyles v. State,* 63 Md.App. 376, 382, 492 A.2d 959 (1985); *State v. Lyles,* 308 Md. 129, 135–36, 517 A.2d 761 (1986); *Ford v. Tittsworth,* 77 Md.App. 770, 773, 551 A.2d 945 (1989), overruled on other grounds, *Nelson v. Carroll,* 350 Md. 247, 711 A.2d 228 (1998). It was with respect to that criminal counterpart that Judge Orth observed for this Court in *Williams v. State,* 5 Md.App. 450, 455–56, 247 A.2d 731 (1968):

It is because of this difference in the posture of *the issue of the sufficiency of the evidence* that *we may entertain the issue on appeal in a jury case only upon the denial by the lower court of a motion for judgment of acquittal but we must entertain the issue in a non-jury case* when presented on appeal *even in the absence of a motion for judgment of acquittal below.*

(Emphasis supplied).

In a non-jury case, such as this, an automatic review of the legal sufficiency of the evidence is provided by Maryland Rule 8–131(c):

**Action tried without a jury.** *When an action has been tried without a jury, the appellate court will review the case on* both the law and *the evidence.* It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

(Emphasis supplied).

In *Starke v. Starke,* 134 Md.App. 663, 669, 761 A.2d 355 (2000), this Court explained why a formal motion is not

necessary to preserve for appellate review a challenge to the legal sufficiency of the evidence to support a verdict in a non-jury case.

Historically, no such authority existed in either court trials or jury trials. In a jury trial, however, it effectively existed because a trial judge's legal decision as to whether the evidence was sufficient to permit the case to be submitted to the jury was reviewable as a matter of law. *No such review of the sufficiency of the evidence was traditionally available in a court trial, however, because a judge, in his capacity as a legal referee, was not required to make a legal ruling before submitting the case to himself, in his capacity as a fact finder.*

The procedural formality that attends the passing of a case from a legal-referee judge to a fact-finding jury is not present when a judge alone, playing two distinct roles, passes the case from the left hemisphere of his brain, where he "thinks" as a legal referee, to the right hemisphere of his brain, where he "feels" as a fact finder. No legal ruling is involved in the turning of that switch within the brain. *Because no legal ruling is involved, there was historically no available mechanism for an appellate court to review on the evidence the verdict of a fact-finding judge.*

The predecessor provisions to what is now Rule 8–131(c) conferred on appellate courts the authority to rule on the legal sufficiency of evidence in court trials by applying the clear error standard of review. *Such appellate review of a verdict on the evidence became available on the civil side in 1941 and on the criminal side in 1950.*

(Emphasis supplied).

In this case, therefore, Slick's challenge to the legal sufficiency of Ms. Reinecker's evidence of gain has been fully authorized by Rule 8–131(c) (or its predecessors) since 1941.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**