SCHAUB ET AL. *v.* COMMUNITY CAB, INC.

[No. 169, October Term, 1950.]

*Decided June 15, 1951.*

The cause was argued before MARBURY, C. J., and COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Sol C. Berenholtz,* with whom were *Smalkin & Hessian* on the brief, for the appellants.

Submitted on brief by *John Grason Turnbull* and *Walter B. Siwinski,* for the appellee.

GRASON, J., delivered the opinion of the Court.

Josephine L. Schaub, the wife of Joseph A. Schaub, lived at Edgemere, in the neighborhood of Sparrows Point, in Baltimore County. On November 1, 1949, she visited her sister, and about six o'clock P.M. started home via the North Point Road when the accident involved in this case occurred.

The declaration in this case (consisting of one count) was brought by Mrs. Schaub and her husband jointly against the Community Cab, Inc., a body corporate, and the Airline Limousines, Inc., a body corporate, defendants. Damages were claimed by the wife for pain and

permanent injuries suffered, and by the husband for loss of services to him of the wife and for doctors' bills and expenses incident to treatment of the wife's injuries. Pleas were filed by the defendants. Before taking testimony the plaintiffs dismissed the case against Airline Limousines, Inc., and proceeded to trial against the remaining defendant under the general issue plea. The jury returned a verdict for the plaintiffs for $500.00. The plaintiffs filed a motion for a new trial and a motion in arrest of judgment. The defendant filed a motion for judgment *n.o.v.* The court overruled the plaintiffs' motions and granted the defendant's motion and entered a judgment for the defendant. Plaintiffs appealed.

The North Point Road is a boulevard and runs, generally, north and south. It is divided into two lanes, separated by a grass plot. The east lane carries north bound traffic, the west, south bound traffic. Each of these lanes will accommodate three cars. They are of macadam construction and a part of these lanes have a concrete curb about six inches high and of arc-like construction. The speed limit is fifty-five miles per hour.

Mrs. Schaub, who is forty years of age, testified: "It wasn't raining very hard but it was raining"; the witness Potts: "there was a drizzling rain at the time"; the witness Steinsapir: "the weather was very bad. It was raining and a little foggy and it was pretty hard to see. It was pretty bad visibility. Nighfall had set in"; the witness Tucker (who was the driver of the taxicab involved in the accident) testified: "it was a right bad night—very bad"; and again, on cross examination, he testified: "I could see good out of them. I had the windshield wipers on; it was all right; I could see perfect ahead". From this testimony it is clear that at the time of the accident night had set in and it was drizzling rain and visibility was bad, although with the aid of the windshield wipers Tucker could see the road in front of him and it was perfectly safe to operate the cab, if he exercised due care and caution. His headlights were on at the time.

As Mrs. Schaub drove her automobile on the west lane of the boulevard, which carries south bound traffic, (the weather being as we have described) the left wheels of her automobile ran off the macadam base into the mud to the westernmost side of the grass plot and stalled. Mrs. Schaub, at that time, was wearing a black sport dress, black coat, black low-heeled shoes, and carrying a black purse. She got out of her car at that place and proceeded across the grass plot in the center of the highway. "I crossed to where that cable is in the grass plot and waited for a chance to get across the road, for north bound traffic, which is the east side of the highway, so that I could go over to the Crown garage. I stood there with my collar up on account of the drizzle, with my purse in my hand, holding my collar, and it slipped out of my hand. Several cars went by as I was waiting and when the purse slipped out of my hand I saw a car in the center lane of the road about 125 feet away and another car coming out of Old North Point Road. I saw an automobile coming about the center of the road going north, but it was a good distance away. He was past the traffic light at the North Point Road and in the center of the highway and he looked a good distance away. I saw another car coming out of the Old North Point Road. There was plenty of time to pick up my purse, so I stooped to pick it up. * * * Visibility wasn't bad because the Crown garage is right across the road and they had a big floodlight on, and where I was standing it was pretty well lit. From the time that I stooped over to pick up my purse until the time that I was hit I had not gotten off the curb. My purse had fallen in front of me about a half a foot on the roadway in front of the curb on which I was standing. It was a sort of a misty rain at the time. It wasn't raining very hard but it was raining. * * * I was facing the garage on the east side of the highway. There was nothing to the right of me to obstruct my view."

The defendant owned the cab in question and was in the business of transporting people over the public high-

way. Its cab, on this occasion, was operated by its chauffeur, Joseph Tucker, a man sixty years of age who had operated motor vehicles for twenty-five years. He picked up three seamen at Sparrows Point and was driving them to Baltimore City when the accident happened. The passenger Potts was seated on the rear seat directly behind the driver. He testified that the car was going at a good rate of speed. "I will say between 35 and 40 miles an hour. It could have been going faster. * * * It was just after dark. The headlights of the cab were burning". He said he knew the taxicab struck a person— "I saw a person". He does not know whether the person was a man or woman. "It was just a fraction of a second before he hit her, but I could not say it was a man or a woman. All I know it was a human being." This person he saw was on "the left side of the cab" and the cab driver did not make any effort, to his knowledge, to slow down before he struck her. He testified that Tucker did not know that he hit her and he remonstrated with him and repeated his remonstration before he stopped, which he said was "a good one hundred yards" from where Mrs. Schaub was found. The upper part of her body was on the grass plot and her legs protruded over into the highway, at a right angle to the highway. He said that he did not know how far away from the grass plot the cab was before the accident. He further testified: "I could not tell where she was" (when she was hit).

The witness Steinsapir was a passenger in the taxicab. He was sitting in the rear seat next to Potts and he said he got the cab at Sparrows Point around six o'clock. He testified: "When we were driving along the road * * * I heard the bump of the car, so I said—'You probably hit something, a rabbit or something'. Potts was sitting beside me and he looked around and said 'That is a human being'. So it took us at least a few minutes before he stopped the car. He was going pretty fast and I am pretty sure the driver never saw anything. He never even noticed that we hit something. Just

before I heard this bump, the cab was being operated on a pretty high speed, for it took him a pretty long time before he gets the cab stopped up. It was a pretty wide road. Before I heard this bump the driver did not make any effort to stop his car. We were going just the same like we started out. He did not make any effort to swerve his car before the accident. When I said that he hit a rabbit or something the cab driver did not try to stop the car then. * * * We all got out and went back to where the body of this lady was lying, but before that he backed the car back awhile, I would say about 35 or 40 yards. Then we started to walk back towards the body. She was laying with her head up in the grass and her body and legs out on the road. Before I heard the thump the cab was on the left side of the road, pretty close to the grass plot." He testified on cross examination that he could not see the woman on the outside of the car and he would not say how far the taxicab was being operated from the grass plot. "I would say we were pretty close by there." He estimated that the cab was being operated about a foot from the curb, but testified he really did not know how far it was being operated from the curb. He testified that at the time of the accident "the driver was proceeding, I would say, between 50 and 60 miles an hour. When he finally decided to stop, it took him at least 30 or 40 yards to stop. He did not stop right after the woman was hit. It is pretty hard for me to say exactly, but the only thing I will say now, he drove pretty fast, and if he backed 45 or 50, it is pretty hard for me to estimate just exactly how fast, but he drove very fast."

The third passenger in the car was not produced at the trial, nor were depositions of that passenger read in evidence.

Corporal Weber, of the Baltimore County Police Department, testified where Mrs. Schaub was lying, as described by previous witnesses, and that he examined the cab involved in the accident and "found that on the left front door and between the front left side of the

windshield, the metal panel between the windshield and the left door, there was a dent right above the left door approximately about 10 inches long and about 3 inches wide. There was a dent in the chrome strip that is located on the left front fender behind the wheel. There is a strip that fastens to the fender that has a small dent in it approximately 12 inches long. That was between the left front wheel and the door, and I don't remember any other evidence of impact or any other mark on the cab. * * * The notes that I took at the time don't disclose any other mark. The speed limit at that point where the accident occurred is 55 miles per hour. I talked with Mr. Tucker that evening. There was nothing abnormal or unusual about him other than possibly being excited." In reference to the garage spoken of by Mrs. Schaub, he testified: "I have seen the garage at night. I wouldn't say that it throws any direct light across the road. It does light up some from the garage." And in response to a question as to whether or not there were a couple of spotlights extending pretty high in front of the garage, he answered: I would not say that the place is lit. It does have lights but I wouldn't be able to point out any particular light how high they were."

Mr. Graff, the president of the defendant corporation, saw the cab involved in the accident about 11 o'clock that night. He said: "There was a dent over the left front door, which was not there when I went out to work that evening. I did not notice any other damage that night, but next morning we picked a tooth out of this rain spout, right over top of the ventilator. We repaired the cab about three or four weeks afterward. The reason I had it repaired, it sprung the windshield and the windshield swung water. Every time it rained water would run inside the car."

Tucker, the driver of the cab, testified that he noticed Mrs. Schaub about four or five feet to his left and that she grabbed for his car and that she was moving very fast. "Q. And you say she was standing in the road-

way? A. No sir, she was coming toward me walking very fast. She was on the grass plot. Q. (The Court) That is when you first saw her? A. No, sir, she was coming from that away; when I see her she was in the road with her hands up like that (indicating), like she was going to grab my cab. * * * Q. How far was she from the road? A. About two or three foot; she was off the curb. Q. (Mr. Berenholtz) When Mr. Turnbull questioned you in direct examination you did say she was, to use your exact language—he asked you where she was, whether she was off the curb or on the hard part of the road; you said, 'When I saw her she was off the curbing as she had to be because I was three feet from the curb.' It that right? A. That is right." He said that he did not see her step off the curb and that he did not see her until she was in the highway.

"Where it is manifest to the court upon the plaintiff's own showing and the uncontradicted evidence in the case that there is no rational ground upon which a verdict can be based for the plaintiff, it becomes the duty of the court to direct a verdict for the defendant, or, as in this case, grant a motion for a judgment *n.o.v.* in favor of the defendant." *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 532, 59 A. 2d 313, 316; *Bearings Service Co. v. Balto. Transit Co.,* 197 Md. 1, 77 A. 2d 779.

The facts in the case disclose that Mrs. Schaub, at about 6:30 o'clock on the 1st of November, 1949, left her automobile, which was stalled, in the south lane of the North Point Road. She was dressed in dark clothes, carrying a dark colored purse, and crossed over the plot between the two lanes, destined for a garage located on the east side of the east lane of the boulevard, which carries north bound traffic. When she arrived at the curb on the west side of that lane she stood on the curb to await the passing of several north bound cars. It was drizzling rain. With one hand she was holding the collar of her coat to protect herself from the rain, and with the other hand, the purse. It slipped

and fell into the highway, about six inches from the curb. This curb arched from the macadam of the highway about six inches. She said that she stooped over to retrieve it. As she stooped over she saw two cars about one hundred and twenty-five feet from where she was standing. One of these cars was coming into the highway from the Old North Point Road, the other was traveling in the highway, about the middle thereof. She reached for and recovered her purse and was in the act of straightening up to a standing position on the curb, when she was struck and thrown in the manner which we have described. The car that struck her, which she saw when it was about one hundred and twenty-five feet south when she leaned over after her purse, turned out to be the taxicab involved in this case.

The question comes, was the lady guilty of contributory negligence as a matter of law? There is no evidence in the record that the cab mounted the curb upon which she was standing and struck her. It was traveling where it had a right to travel. It is true that Tucker, the chauffeur, gives two versions of this accident. On the night of the accident he said he did not see the lady. At the trial he said he did see the lady towards the left of his car, with her hands up; and the marks on the cab, described in the evidence, tend to corroborate his testimony that he did see her. The lady says that she could have been seen in the light thrown from the garage on the east side of the lane which carries north bound traffic, a little to the south of where she was standing. One of the passengers in the taxicab said that as he glanced to the left and at the time he heard a bump he saw a person. He did not know whether it was a man or woman, nor did he know where the person was. The other passenger thought that the taxicab had run over a rabbit, but at the demand of the passenger who saw "a person" the car was stopped some distance from where they heard the bump, and they returned to the scene of the accident and found the lady. One of the passengers estimated the speed of the taxicab

to be between "35 and 40 miles an hour. It could have been going faster". The other passenger said that it might have been traveling between fifty and sixty miles an hour, but later said he really couldn't say how fast it was traveling. Tucker, the chauffeur, said he was running about forty-five miles an hour. His lights were on, his windshield wipers were working, and no traffic was in front of him. He said he was traveling from three to four feet from the curb. Mrs. Schaub said that he was traveling so close to the curb that he hit her as she was arising to a standing position after retrieving her purse. From the evidence we are unable to say that the speed of the cab was excessive or unlawful.

It is trite to say that the mere happening of an accident raises no presumption of negligence and the burden of proof is upon the party charging negligence; and, where contributory negligence is relied on, the burden of proof is upon the defendant to show that the plaintiff was guilty of negligence directly contributing to the accident. *Eisenhower v. Balto. Transit Co., supra.* Negligence is relative and not absolute; it necessarily depends upon the circumstances in each case. *Thursby v. O'Rourke,* 180 Md. 223, 229, 23 A. 2d 656.

In *Crunkilton v. Hook,* 185 Md. 1, 7, 42 A. 2d 517, 520, we said:

> "The degree of care required of a pedestrian to entitle him to recover is such as would be reasonably expected from an ordinarily prudent person under the circumstances. Even though he may have been guilty of some want of caution, yet if he exercised ordinary care he may still be entitled to recover for injuries sustained as the result of the defendant's negligence."

And we quoted in that case from an opinion written by Judge Alvey in *Baltimore & Ohio Railroad Co. v. Fitzpatrick,* 35 Md. 32, 45:

> "'What will amount to ordinary care or the absence of it, in any given case, must always be determined

by the standard of common prudence and experience, in view of the special circumstances. What may be ordinary care with reference to one particular state of circumstances, may fall very far short of it with reference to another. * * *.' "

A number of cases have been quoted and cited on the briefs, some by each side. The law is applied to the facts of those cases. The case at bar is quite different on the facts. The appellants rely strongly on the case of *Epps v. Rainey*, 169 Md. 701, 181 A. 730. In that case the plaintiff was standing on a street corner. A truck rounded so close to the corner that its body protruded over the pavement and struck the plaintiff. That case cannot control this case.

Mrs. Schaub, when she stood on the curb, under the conditions we have outlined, awaiting the passing of traffic, was in a dangerous position. Had she slipped while traffic was passing she might well have been seriously injured or killed. As she stooped to retrieve her purse which had fallen in the highway, she saw a car (what turned out to be the cab involved in this case) one hundred and twenty-five feet south of where she was standing. It was then in the middle of the highway. She does not say how fast she thought it was traveling, but assuming it was traveling at forty-five miles per hour, as Tucker said he thought it was traveling, (which is most favorable to the appellants) translated into time it was less than two seconds from her. She assumed that the cab would stay in the middle of the highway, but it did not; it turned to its left and, according to her testimony, after she had stooped over in the highway and recovered her purse, and before she could arise from this stooping position to a standing posture, she was hit by the cab.

Tucker at first said he did not see her, and so did the passengers in the car.

In *Jendrzejewski v. Baker*, 182 Md. 41, 31 A. 2d 611, the plaintiff was standing in a safety zone. He wanted to cross the road to take a south bound electric car.

It was lawful for automobiles traveling north to pass the safety zone on either side, and when a north bound automobile was less than four seconds in time from him, the plaintiff attempted to cross to the west side of the road and was injured. He thought the automobile was going to the right side of the safety zone, and he left the safety zone and was in the road when he was hit by the automobile. We held that he left a place of safety for a place of peril and was guilty of contributory negligence which barred recovery.

If we assume Mrs. Schaub's version of this accident to be correct she was guilty of contributory negligence as a matter of law, which bars recovery.

At the trial Tucker said he saw Mrs. Schaub at the time of the accident; that she was in the road, and when he first saw her she was close to his cab with her hands up and grabbed the hood of the car. If we assume this to be the correct description of the accident, the lady was guilty of contributory negligence as a matter of law.

There is no evidence in the record upon which the doctrine of last clear chance could be based. The action of the learned judge below in granting judgment *n.o.v.* was correct.

*Judgment affirmed, with costs.*