56 A.3d 323

**Marvin A. ADDRESS, et al.**

v.

**Robert MILLSTONE, et al.**

**No. 2486, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Nov. 21, 2012.

64

James R. Schraf (Logan, Yamkas, Vidmar & Sweeney, LLC, on the brief) Annapolis, MD, for appellant.

Gary R. Jones & Trace Krueger (Baxter, Baker, Sidle, Conn & Jones, P.A., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., GRAEFF, and HOTTEN, JJ.

KRAUSER, C.J.

Robert Millstone, together with one of his employees,[1] brought an action in the Circuit Court for Montgomery County against his insurance broker, Marvin A. Address and Marvin A. Address & Associates, Inc. (collectively "Address"), alleging negligence, breach of contract, negligent misrepresentation, intentional misrepresentation, and constructive fraud in the sale, by Address, of numerous life insurance policies to them. Millstone later added, as plaintiffs, his two adult daughters, who were either beneficiaries or owners of one or more of the policies in question.

When a jury entered judgment in favor of Millstone on the breach of contract claim and awarded him $958,807.50 in damages, Address and his company noted this appeal,[2] presenting three issues for our review:

I. Whether Millstone had standing to pursue his breach of contract claim against Address.

II. Whether there was sufficient evidence to submit Millstone's breach of implied contract claim to the jury.

---

1. The employee was David Caffee, and he is not a party to this appeal.

2. .The jury also found in favor of Caffee and awarded him $26,822.72 in damages. That judgment is not before us.

III. Whether the jury's finding of contributory negligence on Millstone's negligence claims also barred recovery on his breach of contract claim.

Because we conclude that Millstone had neither standing to bring suit as to insurance policies which he, himself, did not own nor adduced sufficient evidence, at trial, that Address had breached any contract he purportedly had with Millstone, we shall reverse the judgment entered below, remand the case with instructions to enter judgment in favor of appellants, and forego addressing appellants' third issue, as it is rendered moot by the foregoing rulings.

### Background

The dispute in the instant case arises from a long-term business relationship between Robert Millstone, the CEO of Atlantic Recycling Group and a principal in Montgomery Scrap Corporation,[3] and Marvin Address, an insurance broker and President of Marvin A. Address & Associates, Inc. Early in their relationship, Millstone, with the assistance of Address, purchased a series of term life insurance policies.

A term life insurance policy provides for the payment of a death benefit to one or more designated beneficiaries, in return for the payment of a fixed, periodic premium, if the insured dies during the term of the policy. This type of policy is sometimes described as "pure" insurance, because its price is determined by the amount required to pay for the death benefit, on average (the "cost of insurance"), and it does not accrue any additional "cash value" but, rather, at the expiration of a specified term, the policy terminates without value. Moreover, because the cost of insurance increases with age, renewal of a term policy entails substantially higher premiums than those charged for the expiring term policy. *See Am. Elec. Power, Inc. v. United States*, 136 F.Supp.2d 762, 766

---

**3.** Millstone's company, Montgomery Scrap Corporation, merged, in 2006, with Atlantic Recycling Group, of which Millstone is now the CEO.

(S.D.Ohio 2001); *Fairbanks v. Farmers New World Life Ins. Co.,* 197 Cal.App.4th 544, 547, 128 Cal.Rptr.3d 888 (2011).

Eventually, Millstone became interested in purchasing whole life insurance policies, because such policies, unlike term insurance policies, accumulate, over time, a "cash value" which may be redeemed or borrowed against by the policy owner.[4] *See, e.g., Dow Chem. Co. v. United States,* 250 F.Supp.2d 748, 754 (2003), *rev'd on other grounds,* 435 F.3d 594 (6th Cir. 2006); *Gaidon v. Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 342, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999). Moreover, a whole life policy usually provides more favorable terms for a potential borrower than a typical bank loan, since, by borrowing against the policies, an insured retains the option to defer paying back a policy loan or not paying it at all.

After communicating his objectives to Address, which were to protect his family and to be able to borrow money against his insurance policies, Millstone, from 1986 through 1999, directed Address to purchase eight whole life policies from the Phoenix Life Insurance Company (the "Phoenix whole life policies"). Of those eight policies, which had a combined death benefit of $7,773,728,[5] Millstone retained ownership of seven and transferred ownership of the remaining one to his daughters. The seven Phoenix whole life policies owned by Millstone designated either his daughters, his wife, or both, as the beneficiaries, while the policy owned by his daughters named only them as beneficiaries.

As was anticipated, Millstone borrowed money against the seven insurance policies he owned, as the need arose in his business dealings. As he put it, he pursued a strategy of

---

**4.** The cash value of a whole life policy grows over time because the premium charged is substantially higher than the cost of insurance. *See Am. Elec. Power, Inc. v. United States,* 136 F.Supp.2d 762, 766 (S.D.Ohio 2001).

**5.** There are certain references in the record to a combined death benefit of the Phoenix whole life policies of $9,910,996.10. Although this difference is not explained by the parties on appeal, it appears that there were riders on certain of the Phoenix whole life policies that increased the death benefit payable under the policies.

using whole life insurance policies as a means of "forced savings" and furthermore developed a formula for estimating the amount of life insurance he should have in effect at any given time, as a proportion of the value of his business.

During the years that Address served as Millstone's insurance broker, Address was, in the words of Millstone, "always suggesting that [Millstone] engage in estate planning." To that end, Address, in 2001, urged Millstone to put his insurance in an irrevocable life insurance trust (an "ILIT") for estate planning purposes. Such a plan required Millstone to periodically transfer funds to the ILIT. A notice would then be sent to the beneficiaries, informing them of the opportunity to withdraw some or all of those funds but with the tacit understanding that they would not, so that the funds would be deemed to constitute a "completed gift" to the ILIT. Once the gift was completed, the funds belonged to the ILIT, not to Millstone, and would then be used by the ILIT to pay life insurance premiums when they became due. This procedure ensured that the life insurance policies and the death benefits payable under them would be excluded, under Internal Revenue Service rules, from Millstone's gross estate upon his death, thereby resulting in a lower estate tax.

Millstone claimed that he told Address that he had no objection to the plan, as long as he could continue to borrow money against the policies. Address, on the other hand, denies this, pointing out that the retention of such a right would have been inconsistent with the irrevocable trust. For to permit the "settlor," that is, the person who establishes the trust—in this instance, Millstone—to borrow against the trust's life insurance policies, now owned by the ILIT, would have the effect of invalidating the trust, thereby extinguishing the tax benefits it offers.

In any event, Millstone directed Address to work with Millstone's attorney, Ron Lyons, to create the ILIT. In the spring of 2001, Address called Lyons to discuss the creation of the ILIT. "[A]gree[ing]," as Lyons put it, "that an ILIT was an appropriate vehicle to put the insurance in," Lyons drafted

the documents establishing the trust, naming himself and Millstone's wife as trustees. Sometime later, in May of 2001, Lyons, Millstone, Mrs. Millstone, and Address met in Lyons's law office, where they executed the documents establishing the insurance trust.

To accomplish the necessary separation between the settlor, that is, Millstone, and the trust corpus, Lyons testified that, "more often than not," an insured will place a new insurance policy in the ILIT, rather than transferring an existing policy. The "principal reason" for doing so, he said, is the "three-year look back," which is also known as the "contemplation of death" rule. He explained:

> If you move an existing policy into the irrevocable insurance trust and you die within . . . three years of [the formation of the trust], . . . the proceeds of that policy will still be included in the decedent's gross estate. If you put a new policy in and die within those three years, it's not included in the gross estate.

To obtain the benefits of that rule, after the ILIT was created in 2001, seven of the eight Phoenix whole life policies, that is, the seven owned by Millstone, were "surrendered," and a new life insurance policy, issued by the Security Connecticut Life Insurance Company (the "Security Connecticut universal life policy"), was purchased by the ILIT, using funds given to it by Millstone.

When a whole life policy is "surrendered," the contract of insurance is terminated, and the insurer pays the owner of the policy the accumulated cash value, after accounting for any outstanding policy loan balance.[6] Address testified that he advised Millstone, in 2001, that seven Phoenix whole life

---

6. Maryland Code (1996, 2011 Repl.Vol.), sections 16–303 and 16–305 of the Insurance Article are the statutory provisions that mandate the conditions upon which an insurer must pay the cash value of a policy upon its surrender as well as establish minimum amounts for that cash value. Section 16–305(d) further defines "cash value" of a "paid-up" policy as being "at least" the present value of the future guaranteed benefits, less the amount of indebtedness to the insurer for any policy loans.

policies were being surrendered and that the "cash value would ... come back to him." Millstone received, as he acknowledged at trial, the cash surrender value of the policies, in the form of seven checks, one for each surrendered policy, which totaled $275,121.25, after deducting Millstone's outstanding policy loan balances of $614,215.97.[7]

Five of the seven checks he received had the words "SURRENDER OF POLICY" printed on them. As to the two checks which were not imprinted with the words "SURRENDER OF POLICY," other circumstances made it obvious that they too were "surrender" checks and not, as Millstone contended, policy loans. The amounts of those two checks were $48,202.67 and $33,560.23, respectively. These amounts were roughly ten to thirty times as large as premium refund checks and, unlike the policy loans, which were typically made in even amounts, such as $10,000, $25,000, or $100,000, and which were always disbursed by checks imprinted with the words "For Loan on Policy," the unmarked surrender checks were not so marked and were not in even amounts. Moreover, the amounts of the two unmarked surrender checks were included in a letter issued by Phoenix, dated June 19, 2001, which included all seven policies surrendered by Millstone, as well as their cash values.

But although all seven checks, either directly or under the circumstances, indicated that they were for a surrendered policy, and although Millstone sent a letter to Address instructing him to "cancel any future drafts against" the policies, and furthermore signed a document entitled "Request for Termination or Release of Policy/Account Value," which listed all seven policy numbers and directed Phoenix to "[t]erminate entire policy" and "[p]ay all proceeds in cash," Millstone testified that, when the Phoenix whole life policies were surrendered in 2001, he was not aware that the policies were being surrendered and that, at that time, he believed the money was a loan to him. He further insisted that he never

---

7. In sum, by surrendering the seven Phoenix whole life policies, Millstone received the cash equivalent of $889,337.22.

personally reviewed the application for the Security Connecticut universal life policy, which replaced the Phoenix whole life policies, or the accompanying "Notice Regarding Replacement," though he did sign those documents. In any event, as of the end of June 2001, only one of the eight Phoenix whole life policies, the one owned by Millstone's daughters and having a death benefit of $2,500,000, remained in effect.

Address testified that, in choosing a life insurance policy to be included in an insurance trust, the "preferable policy is one that has a high death benefit and [the] lowest cash value . . . possible, since the trust normally states you cannot borrow the cash value," as otherwise, the estate tax shelter would not be available. Accordingly, Address chose for the ILIT the Security Connecticut universal life policy, which had a low premium, a high death benefit, and minimal cash value. Moreover, as Address pointed out, the combined cost of the premiums for that universal life policy and the one Phoenix whole life policy that remained was "considerably" less than the premiums that Millstone had been paying.

Like whole life insurance, but unlike term insurance, universal life insurance is intended to provide coverage throughout the lifetime of the insured, and, because its "[p]remium payments in the initial years" of the policy "similarly exceed insurance and administrative costs," like whole life, universal life insurance is a form of "cash value" insurance. Daniel R. Fischel and Robert S. Stillman, *The Law and Economics of Vanishing Premium Life Insurance*, 22 DEL. J. CORP. L. 1, 6 (1997).

Address stated that he reviewed illustrations of the Security Connecticut universal life policy with both Millstone and his attorney, Ron Lyons, before it was purchased. In fact, Millstone acknowledged signing a "numeric summary" of the policy, which illustrated the projected cash surrender value of the policy at the conclusion of four different time periods based on three different interest rates. The lowest interest rate, which was the only rate that was "guaranteed," resulted in a cash surrender value of "$0" at the end of each period.

During the time period from 1999 to 2002, Millstone's business was experiencing cash flow problems. While the Phoenix whole life policies were still in effect, Millstone had borrowed against them, but after they were surrendered by him, he could no longer use those policies for that purpose. To alleviate his cash flow problems, Address proposed that the Security Connecticut universal life policy be surrendered and replaced by a new policy, offered by Phoenix, having the same death benefit but which offered a special feature, called "premium financing." Premium financing permits the insured (or the entity paying the premiums on behalf of the insured, such as a trust) to borrow the funds necessary to pay the life insurance premiums from a finance company, typically selected by the insurance company.

Under the terms of the new policy, Millstone could obtain a ten-year, "interest-only" loan from the finance company and execute a personal guarantee: Millstone's out-of-pocket expense, for the first ten years, would be $8,000 annually, a tiny fraction of the premiums he had been paying, but, at the end of the ten-year term, he would have to pay the entire accrued principal, $2.5 million, which was ten times the annual premium of $250,000.

Lyons, as trustee, was concerned that the arrangement was too risky, and he advised Millstone against it. Heeding that advice, Millstone declined Address's proposal to purchase for the ILIT the new Phoenix life insurance policy, permitting an interest-only loan.

Instead, in December 2002, the Security Connecticut universal life policy that was in the ILIT was replaced with a universal life policy from Phoenix (the "Phoenix universal life policy"), with the same death benefit, $7,500,000, and a premium that was guaranteed to remain fixed at a specified level for a longer period of time than that provided by the Security Connecticut universal life policy. The net result was a reduction in total premiums from $116,000 to $105,000 per annum, but the projected cash surrender value, after ten years, was reduced from $1,047,000 to $542,000. The Phoenix universal

life policy was owned, as was the Security Connecticut universal life policy it replaced, by the ILIT, not Millstone. The application for that policy was executed by Millstone, as the insured, and Lyons, as the trustee of the ILIT.

At some point thereafter, Millstone discussed with Lyons the prospect of borrowing money against the policy in the ILIT but was told by both Lyons and Address that, because of the terms of the trust agreement, he could not do so. Millstone then instructed Lyons that the ILIT be dissolved.

Although it is unclear from the record precisely when that conversation took place, it appears that it was before March 17, 2004. That is because, on that March date, Lyons sent Millstone a copy of a statement reflecting the accumulated cash value of the Phoenix universal life policy that was then in the ILIT, and Millstone, believing that the ILIT had already been dissolved, called Address and expressed his unhappiness that it had not. Address responded, according to Millstone, that "it's an error" and that he would "take care of it." Then, in May 2004, in conjunction with the dissolution of the ILIT, ownership of the Phoenix universal life policy was transferred from the ILIT to Millstone's daughters.

In 2005, Address and Millstone agreed that a universal life insurance policy should be purchased, with funds provided by Millstone, from the Hartford Life Insurance Company (the "Hartford universal life policy"). Coinciding with that purchase, both the Phoenix universal life policy, with a $7,500,000 death benefit, and the Phoenix whole life policy owned by Millstone's daughters (and which remained in place after the other seven Phoenix whole life policies had been surrendered in 2001), with a $2,500,000 death benefit, were themselves surrendered. The Hartford universal life policy, which was also owned by Millstone's daughters, had a death benefit of $10,000,000 and a lower premium than the surrendered policies.[8]

---

8. In addition, the Phoenix universal life policy contained an "option term" provision which could result in higher premiums in future years,

By 2007, business conditions had improved, and, in a departure from his previous practice, Millstone decided to take out a policy loan for his personal use. As he was, at that time, interested in purchasing a piece of real estate in New York, he called Address to inquire as to the accumulated cash value of the Hartford universal life policy, in the hope of paying some or all of the purchase price of the property with the loan proceeds. When Address told him that he could only get about $50,000, Millstone called his accountant and asked him to "start an investigation and find out why there's no money in" that policy. He then arranged to have the Hartford universal life policy cancelled and ceased any further business dealings with either Address or his insurance brokerage.

On August 26, 2008, Millstone and David Caffee,[9] an employee of Millstone's company, Montgomery Scrap Corporation, filed this action against Address and his brokerage, Marvin A. Address & Associates, Inc., alleging negligence, breach of contract, negligent misrepresentation, intentional misrepresentation, and constructive fraud relating to the purchase and surrender of the life insurance policies. The damages requested were purportedly engendered by a "loss of cash value of the policies, adverse tax consequences, and loss of premiums paid."

In response, Address raised, among other defenses, that Millstone had "failed to join an indispensable party or parties," that he "lack[ed] standing to bring th[e] lawsuit," that he had been contributorily negligent, and that the claims were barred by the three-year statute of limitations because Millstone was aware of the conduct at issue when he received the March 17, 2004 letter from Lyons about the cash value in the ILIT. That led to the filing of an amended complaint, adding Millstone's daughters as plaintiffs.

---

while the Hartford universal life policy did not include such a provision.

9. Although not relevant to this appeal, we note that Millstone, through Montgomery Scrap Corporation, provided life insurance to Caffee which was obtained through Address's insurance brokerage.

A jury trial was held in November 2009. At trial, Millstone claimed that he suffered damages of $1,467,031.43. He maintained that those damages were due to a loss of principal resulting from the premature surrender of the 1996, 1997, and 1999 Phoenix whole life policies; the loss of principal resulting from the cancellation of the 2005 Hartford universal life policy; premiums paid from 2001 through 2009; and 5% interest.

At the close of Millstone's case, Address moved for, and the circuit court granted, judgment in his favor on the counts alleging intentional misrepresentation and constructive fraud. He also moved to dismiss the counts alleging negligence and negligent misrepresentation, asserting that Millstone lacked standing to pursue those claims because the trust, and not Millstone, suffered damages, if there were any, from the transactions at issue. The circuit court declined to dismiss those counts.

The jury found that Address was negligent and made negligent misrepresentations with respect to the transactions at issue but that Millstone was contributorily negligent. Consequently, judgment was entered in favor of Address on those two counts. The jury also found that Address breached an express or implied contract with Millstone and awarded Millstone $958,807.50 in damages.

No verdict was rendered as to the claims of Millstone's daughters, and, thereafter, the parties filed a stipulation dismissing the daughters' claims. Address then noted this appeal.

## Discussion

### I.

Address contends that the circuit court erred in "finding that Millstone had standing to pursue breach of contract claims against [him]," pointing out that, after the surrender of the Phoenix whole life policies, in 2001, "Millstone was never the owner of any of the policies that were procured by Address." Rather, the policies at issue either belonged to the trust established in 2001 (the ILIT), at the direction of Mill-

stone's attorney, Ron Lyons, or to Millstone's daughters, to whom the trust corpus was conveyed, in 2004, after Millstone directed that the trust be dissolved.

Millstone responds that Address "mischaracteriz[es]" his theory of damages and that, in any event, the issue is not preserved for appeal because Address first raised his "standing" issue in a motion for judgment and, furthermore, did not object to either the testimony of Millstone's damages expert or to the jury instructions. He further maintains that his "claims were not based on the policies he purchased for the trust, but on the advice he directly received from" Address, as well as "the policies he was advised to sell and the commissions [Address] received as the result of such sales."

At the outset, we find Millstone's non-preservation argument wanting. Address, in his answer to the complaint, included among his defenses that Millstone "lack[ed] standing to bring this lawsuit," that he did "not have the capacity to sue in this case," and that he did "not have the authority to sue in a representative capacity." Then, in his motions for judgment—both of which were denied [10]—Address raised those same issues "with respect to all counts," asserting that, once Millstone conveyed assets to the ILIT so that it could then purchase life insurance policies, he no longer retained any interest in those assets and, consequently, did not suffer any damages. Under Maryland Rule 8–131(a), an appellate court will "ordinarily" not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court." Plainly, this rule was satisfied, and the "standing" issue is preserved for appellate review.

■ As the standing issue was preserved, we shall now address it. Our analysis begins by noting that Section 1.04 of the trust agreement, which, as noted earlier, was drafted by Millstone's counsel and executed in 2001, states that "[t]he

---

10. The circuit court granted Address's motion for judgment on the counts alleging intentional misrepresentation and constructive fraud, but on grounds of insufficient evidence, not standing.

Settlor," that is, Millstone, "retains no interest, vested or contingent, in the property of the [T]rust." And, in "no event shall any property transferred to this Trust revert to the Settlor or to the Settlor's estate." Thus, according to its express terms, the trust agreement divests Millstone of any interest in the trust.

As explained by the author of a leading treatise on this subject, "[a]fter a settlor has completed the creation of a trust, the settlor is not," with limited exceptions that are not applicable here,[11] "in any legal relationship with the beneficiaries or the trustee, and has no rights, liabilities or powers with regard to the trust administration." Amy Morris Hess, The Law of Trusts and Trustees, § 42 at 445 (3d ed.2007) (hereafter "Bogert on Trusts"). Hence, in establishing an irrevocable life insurance trust (or, indeed, any irrevocable trust), "the settlor must permanently give up control of the gift property." *Id.,* § 234 at 57.

Although no Maryland appellate cases address this precise issue, our holding is consistent with existing Maryland caselaw. For example, in *Krauch v. Krauch,* 179 Md. 423, 425–26, 20 A.2d 719 (1941), a dispute over ownership of a leasehold interest in real property, which had previously been owned by the deceased mother of two brothers, one brother sued the other, seeking the appointment of a trustee to convey the property to both of them. When the demurrer of the defendant brother was overruled, he appealed, contending, among other things, that the personal representative of the deceased mother should have been added as a party. *Id.* at 425–27, 20 A.2d 719. Affirming the lower court, the Court of Appeals observed that the personal representative was not a "neces-

---

11. Unlike what occurred here, the settlor may reserve powers to revoke or modify a trust if the trust instrument itself so provides, and he may "attack the validity of the trust and seek recovery of the trust property if, for example, the rules regarding perpetuities or suspension of the power of alienation are violated by the terms of the trust." Amy Morris Hess, The Law of Trusts and Trustees, § 42 at 448–49 (3d ed.2007). Other examples include the settlor's lack of capacity, fraud or undue influence, or forgery of the trust instrument. *Id.* at 449. None of these exceptions applies to the instant case, nor does any party so contend.

sary party"[12] because the mother "had parted with the property" prior to her death, and, consequently, the personal representative did not hold legal title to the leasehold at issue. *Id.* at 425–26, 20 A.2d 719. Although that case involved a court-imposed trust, the deceased mother was essentially the settlor of that trust, and, like the settlor here, she no longer had an interest in the trust after having permanently conveyed her property.

Among the extraterritorial authorities[13] cited by Address in support of his claim that Millstone had no standing, *Pike v. New York Life Insurance Company,* 72 A.D.3d 1043, 901 N.Y.S.2d 76 (N.Y.App.Div.2010) (per curiam), is most instructive. In that case, a husband and wife, on their own behalf and that of their minor children, purchased several life insurance policies and annuities from New York Life Insurance Company. Thereafter, the parents and their children brought suit against New York Life and two of its agents, alleging, among other things, breach of contract and fraudulent misrepresentation. Their complaint alleged that one of the defendant insurance agents had "induced them to purchase multiple policies which were unsuitable for their needs and which they could not reasonably afford." *Id.* at 1046, 901 N.Y.S.2d 76.

Several counts in the complaint were based on insurance policies owned by a third party who was not a party to the suit, namely, the custodian of the policies for the minor children. As to those counts, the New York appellate court held that they should have been dismissed for lack of standing,

12. As explained in a well-known treatise, under former Maryland terminology, a "necessary" party was akin to what had previously been termed, in Federal practice, an "indispensable" party, that is, a party that is required to be joined before an action may proceed. Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 139 (3d ed.2003). *See* Md. Rule 2–211 ("Required joinder of parties").

13. *Moore v. John Hancock Life Ins. Co.,* 876 So.2d 443 (Ala.2003); *Pike v. New York Life Insurance Company,* 72 A.D.3d 1043, 901 N.Y.S.2d 76 (N.Y.App.Div.2010) (per curiam); *Berardino v. Ochlan,* 2 A.D.3d 556, 770 N.Y.S.2d 75 (N.Y.App.Div.2003) (per curiam); *Orentreich v. Prudential Ins. Co. of Am.,* 275 A.D.2d 685, 713 N.Y.S.2d 330 (N.Y.App.Div. 2000) (per curiam).

observing that "[o]nly the policy owner has standing to sue based on an insurance policy." *Id.* at 1049, 901 N.Y.S.2d 76. *Accord Berardino v. Ochlan,* 2 A.D.3d 556, 557, 770 N.Y.S.2d 75 (N.Y.App.Div.2003) (per curiam) (holding that trustee of ILIT "has title to the trust property and fiduciary obligations with respect to the property" and "cannot base his causes of action on an alleged failure to disclose information to" the settlor). We do not believe that either logic or policy would permit any other conclusion to be reached here.[14]

 The ILIT owned the Security Connecticut universal life policy, policy number 2460534R, and the Phoenix universal life policy, policy number 97502030. Millstone's daughters owned Phoenix whole life policy number 2761768 and Hartford universal life policy number U1580662. Hence, Millstone had no standing to sue for damages based on either the alleged premature surrender of those policies or any premiums paid for them. Still, Millstone did own seven other Phoenix whole life policies, policy numbers 54368, 1140882, 2567966, 2593502, 2691819, 2725432, and 2735478, which were surrendered by Millstone to Phoenix Life just before the ILIT was formed. As to those policies, Millstone did have standing to sue for damages that purportedly resulted from their premature surrender.

Because the damages were based in significant part, so far as can be determined, on purported losses caused by the alleged premature surrender of policies not owned by Millstone, as well as "misdirected premium payments" for those same policies, we would be required, on this ground alone, to vacate the damages award and remand for a new trial on damages only. But the reversible error does not end here, as we explain in the analysis that follows.

---

**14.** This case does not present the question whether a beneficiary has standing to bring suit under an insurance policy belonging to a trust or whether the trustee alone may bring such an action, and we do not consider that question here.

## II.

We next consider whether there was sufficient evidence to sustain Millstone's breach of an implied contract claim, keeping in mind that the only relevant transactions are those involving the surrender of the Phoenix whole life policies. According to Millstone, there was "an agreement between himself and Address whereby Address agreed to provide Millstone with insurance services, gave Millstone advice regarding the purchase of policies, the amount and type of policy, and the cancellation or surrender of policies." In exchange, Millstone "agreed to procure life insurance through" Address's firm, resulting in "financial gain in the form of commissions" to that firm. Claiming that there was no implied contract between Millstone and himself, Address moved for judgment at the close of all of the evidence, a motion which the trial court denied.

██ Because this appeal is from the denial of that motion, we " 'consider all the evidence, including the inferences reasonable and logically drawn therefrom, in a light most favorable to the non-moving party.'" *Smithfield Packing Co. v. Evely,* 169 Md.App. 578, 591, 905 A.2d 845 (2006) (quoting *Univ. of Balt. v. Iz,* 123 Md.App. 135, 149, 716 A.2d 1107 (1998)); *see* Md. Rule 2–519(b). If we find that "there is any evidence, no matter how slight, that [was] legally sufficient to generate a jury question," then we shall conclude that the motion was correctly denied and the case was properly submitted to the jury for its consideration. *Orwick v. Moldawer,* 150 Md.App. 528, 532, 822 A.2d 506 (2003); *accord WMATA v. Reading,* 109 Md.App. 89, 99, 674 A.2d 44 (1996). But, "where the evidence is not such as to generate a jury question, *i.e.,* permits but one conclusion, the question is one of law and the motion must be granted." *James v. Gen. Motors Corp.,* 74 Md.App. 479, 484, 538 A.2d 782 (1988) (Bell, J.). In other words, "[w]here it is manifest to the court upon the plaintiff's own showing and the uncontradicted evidence in the case that there is no rational ground upon which a verdict can be based for the plaintiff, it becomes the duty of the court to direct a

verdict for the defendant." *Schaub v. Cmty. Cab, Inc.*, 198 Md. 216, 223, 81 A.2d 597 (1951).

Address contends that there was no such implied contract between himself and Millstone, relying upon *Slick v. Reinecker*, 154 Md.App. 312, 839 A.2d 784 (2003), where we said that implied contracts [15] "are dependent on mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required." *Id.* at 317, 839 A.2d 784 (citations and quotations omitted). Seizing this language, Address avows that there was no "meeting of the minds" between himself and Millstone because, while Address believed that he was furthering Millstone's long-term estate planning goals, Millstone insists that he wanted to obtain whole life insurance policies as a means of forced savings and against which he could borrow.

"An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600 (2000) (citations and quotations omitted). "Mutual assent is an integral component of every contract." *Kiley v. First Nat'l Bank*, 102 Md.App. 317, 333, 649 A.2d 1145 (1994). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700 (2007).

---

**15.** We actually used the term "implied-in-fact" contract in *Slick v. Reinecker*, 154 Md.App. 312, 317, 839 A.2d 784 (2003). An "implied-in-fact" contract is an actual contract, as here, whose existence and terms are proved by circumstantial evidence. *Id.* In that case, we had to distinguish between an "implied-in-fact" contract and a so-called "implied-in-law" contract. The latter is not a contract at all but, rather, "a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense." *Id.* at 318–19, 839 A.2d 784 (citation and quotation omitted). Here, there is no assertion that Millstone is entitled to recovery under a theory of an "implied-in-law" contract. Consequently, throughout this opinion, we use the term "implied contract" synonymously with "implied-in-fact" contract.

Simply because Address presents a different version of events from Millstone, in recounting their business dealings, does not necessarily mean that there was no manifestation of mutual assent. In fact, the hoary phrase, "meeting of the minds," a locution "commonly used by the courts to determine whether there has been mutual assent," has been called a "misnomer" by the author of a leading treatise. Richard A. Lord, 1 *Williston on Contracts* § 3:2, at 259 n. 1 (West 2007 4th ed.). That is because a "meeting of the minds," taken literally, suggests that there must be an actual or subjective agreement between the parties as a prerequisite to formation of a contract, but "objective assent is all that is required." *Id.*

█ Indeed, "Maryland . . . applies the objective standard as to the formation of contracts, and this standard applies to insurance contracts." *Nat'l Fire Ins. Co. v. Tongue, Brooks & Co.*, 61 Md.App. 217, 225, 486 A.2d 212 (1985); *see Restatement (Second) of Contracts* § 2 cmt. b (1981) (observing that " 'manifestation of intention' adopts an external or objective standard for interpreting conduct" and that a "promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct"). And, in applying that standard here, we conclude that the circuit court erred in denying Address's motion for judgment as to the breach of contract claim.

In reaching that conclusion, we begin with the observation that most of the evidence Millstone presented at trial is rendered irrelevant to our analysis, given our finding that he lacks standing to pursue claims properly belonging to either the ILIT or his daughters. Thus, in determining whether there was sufficient evidence that Address breached an implied contract with Millstone, we need not consider testimony of Millstone's expert witnesses that Address engaged in "[in]appropriate" transactions in 2002 and 2005 and that he should be held liable for "misdirected premium payments" from June 2001 on. Stripped of this irrelevant testimony, Millstone's breach of contract claim boils down to an assertion that Address breached an implied contract by persuading him, in

the words of Millstone's brief, to "premature[ly]" surrender the Phoenix whole life policies in June 2001.

To resolve this claim, we must determine whether the parties manifested an intent to enter into an implied contract at all and, if so, whether its terms were, as Millstone contends, to ensure that he could continue to borrow money against his whole life insurance policies, or, as Address contends (in the alternative), to establish an estate plan for Millstone, which required him to surrender the whole life policies he owned.

██ Preliminarily, we note, there is a distinction between the contractual obligations of an insurance broker,[16] which arise pursuant to a specific sale of an insurance policy, and the open-ended consultancy agreement alleged by Millstone. As to the former,

An agent, employed to effect insurance, must exercise such reasonable skill and ordinary diligence as may fairly be expected from a person in his profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property to be insured, in selecting the insurer and so on.

*Lowitt & Harry Cohen Ins. Agency, Inc. v. Pearsall Chem. Corp. of Maryland*, 242 Md. 245, 254, 219 A.2d 67 (1966) (citation and quotation omitted).

In the case at bar, there is no allegation that the coverage was inadequate or that the insurer was improperly selected, allegations which typically arise from a denial of coverage, *see, e.g., CIGNA Prop. & Cas. Cos. v. Zeitler*, 126 Md.App. 444, 730 A.2d 248 (1999); *Johnson & Higgins of Pa., Inc. v. Hale Shipping Corp.*, 121 Md.App. 426, 710 A.2d 318 (1998), which did not occur. Instead, Millstone contends that he was sold an entirely different insurance product than he wanted or needed

---

**16.** An insurance broker is a "person who, for compensation, brings about or negotiates contracts of insurance as an agent for someone else, but not as an officer, salaried employee, or licensed agent of an insurance company." BLACK'S LAW DICTIONARY 220 (9th ed.2009).

and that Address, as his "trusted advisor," should have known better.

The repeat sales of insurance policies, even over a twenty-year time period, as occurred here, do not necessarily create a binding obligation on the broker to act as a consultant to the insured. And indeed, Millstone's testimony, that he entirely depended upon Address, suspending his own judgment in favor of Address's, is belied by Millstone's admission, during cross-examination, that he had developed, on his own, the "forced savings" strategy as well as his formula for estimating the amount of life insurance he needed, as a proportion of the value of his business at a given time.

■ But even if we assume, for the sake of argument, that there was an implied contract between Address and Millstone and that its terms were broad enough to cover the giving of professional advice, there is no evidence whatsoever that Address breached a duty to Millstone by facilitating the 2001 transactions, which resulted in the establishment of an estate plan and the concomitant surrender of the Phoenix whole life policies.

Millstone stated that, throughout the more than twenty years he dealt with Address, his financial goal was to "have whole life policies and to develop a large cash accumulation so that if [he] needed money," he would be able to take out policy loans instead of applying for bank financing "in a bad time." And, according to Millstone, during Address's consultations with him, Millstone "talked about" his goal of accumulating cash value through his whole life insurance policies, a goal which, according to Millstone, never changed during the relevant time period.

Address, for his part, was aware of Millstone's goal, at least during the time leading up to the creation of the ILIT, acknowledging that, from 1988 through 2001, Millstone "wanted ... protection for his family and he wanted to have the availability to borrow out money if he needed it." But, according to Address, in 2001, he persuaded Millstone to focus on estate planning, and it is undisputed that Millstone and his

wife, with the benefit of the advice of their own counsel, Ron Lyons, signed the necessary documents establishing the ILIT, for the express purpose of estate planning.

If this case were merely based upon a credibility determination, we would be required to uphold the denial of Address's motion for judgment, "because the role of the fact finder is to assess the credibility of the evidence and draw a conclusion from among the inferences which may be reasonably drawn from that evidence." *Poole v. Coakley & Williams Constr., Inc.*, 423 Md. 91, 124, 31 A.3d 212 (2011). There are additional facts, however, that impel us to reach the opposite result.

Among those facts, the two most important ones are that, throughout the relevant time period, Millstone, an experienced and self-described "successful" businessman,[17] was represented by counsel and that Millstone's counsel drafted the trust agreement which established the ILIT and which resulted in Millstone's subsequent inability to borrow against life insurance policies owned by the ILIT. This was not, as Millstone has maintained throughout this case, simply a matter of a sophisticated insurance professional misleading him into a course of action that was against his wishes. Indeed, according to Millstone's testimony, he directed Address to consult with Lyons in drafting the necessary documents to establish the insurance trust, and Lyons confirmed, in his testimony, that Millstone "had gone over this concept of the ... ILIT, and that he wanted [Lyons] to draft it, he also wanted [Lyons] to serve as trustee, along with his wife, as co-trustees."

Nor could a reasonable fact finder believe Millstone's testimony that he thought that the surrender checks he received, in 2001, when the seven Phoenix whole life policies he owned were surrendered, were actually "loans," since the documentary evidence was overwhelming that those proceeds were, in fact, surrender checks. As previously noted, that evidence included the checks themselves, five of which were imprinted

---

17. Although Millstone characterized himself as "a junk dealer," he also testified that he was the principal in a "very cash-intensive and capital-intensive industry" and that he was a "fairly successful" businessman.

with the words, "SURRENDER OF POLICY," a letter Millstone sent to Address which instructed him to "cancel any future drafts against" the seven Phoenix whole life policies, and a document entitled "Request for Termination or Release of Policy/Account Value," signed by Millstone, which listed all seven policy numbers and directed Phoenix to "[t]erminate entire policy" and "[p]ay all proceeds in cash."

Millstone himself, moreover, acknowledged that he had received the full cash surrender value of those seven policies (the only policies for which he has standing to bring suit), $275,121.25, and it was uncontroverted that Millstone further received the benefit of the cancellation of all of the outstanding policy loans collateralized by those policies, which amounted to further consideration of $614,215.97.

▮ In light of Millstone's own actions, in ordering Lyons to take steps to establish the ILIT and, subsequently, in executing the trust agreement, as well as in executing all of the related documents and negotiating all of the checks required to surrender his insurance policies, we hold that, as a matter of law, he cannot now assert that he believed, at the time the ILIT was created, that he did not assent to its terms. To hold otherwise would be contrary to settled Maryland law, that is to say that, where there is no claim of fraud, duress, or mutual mistake, "one having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signature." *Canaras v. Lift Truck Servs., Inc.,* 272 Md. 337, 344, 322 A.2d 866 (1974) (quotation and citations omitted).

Whether Millstone, with the benefit of hindsight, might, years later, have come to regret the results of insurance transactions he made, with the advice of his own counsel, we cannot say. What we can say, however, is that his mere assertions, belied by a veritable mountain of evidence, that he thought that the surrender proceeds were actually policy loans and that he could still, thereafter, borrow unimpeded from an irrevocable trust, the terms of which were drafted by his own counsel, are not a legally sufficient basis for his claim that

Address breached an implied contract for the provision of professional advice and insurance services. Rather, this case presents a situation where "there is no rational ground upon which a verdict can be based for" Millstone, and "it becomes the duty of the court" to grant judgment in favor of appellants. *Schaub v. Cmty. Cab, Inc., supra,* 198 Md. at 223, 81 A.2d 597. In other words, where, as here, the evidence was "not such as to generate a jury question, *i.e.,* permit[ted] but one conclusion," "the question is one of law and the motion" for judgment should have been granted. *James v. Gen. Motors Corp., supra,* 74 Md.App. at 484, 538 A.2d 782. And, in light of our disposition of this issue, we shall not consider Address's third issue, whether the jury's finding that Millstone was contributorily negligent should bar his breach of contract claim, as a matter of law.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF APPELLANTS. COSTS TO BE PAID BY APPELLEE.**